VENDO CO. *v.* LEKTRO-VEND CORP. ET AL.

No. 76–156.   Argued January 19, 1977—Decided June 29, 1977

624

REHNQUIST, J., announced the Court's judgment and delivered an opinion, in which STEWART and POWELL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result, in which BURGER, C. J., joined, *post*, p. 643. STEVENS, J., filed a dissenting opinion, in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post*, p. 645.

*Earl E. Pollock* argued the cause for petitioner. With him on the briefs was *Lambert M. Ochsenschlager.*

*Barnabas F. Sears* argued the cause for respondents. With him on the brief were *James E. S. Baker* and *Thomas L. Brejcha, Jr.*

Mr. Justice Rehnquist announced the judgment of the Court and delivered an opinion in which Mr. Justice Stewart and Mr. Justice Powell join.

I

After nine years of litigation in the Illinois state courts, the Supreme Court of Illinois affirmed a judgment in favor of petitioner and against respondents in the amount of $7,363,500. Shortly afterwards the United States District Court for the Northern District of Illinois enjoined, at the behest of respondents, state proceedings to collect the judgment. 403 F. Supp. 527 (1975). The order of the United States District Court was affirmed by the Court of Appeals for the Seventh Circuit, 545 F. 2d 1050 (1976), and we granted certiorari to consider the important question of the relationship between state and federal courts which such an injunction raises. 429 U. S. 815 (1976).

II

The Illinois state-court litigation arose out of commercial dealings between petitioner and respondents. In 1959 petitioner Vendo Co., a vending machine manufacturer located in Kansas City, Mo., acquired most of the assets of Stoner Manufacturing, which was thereupon reorganized as respondent Stoner Investments, Inc. Respondent Harry H. Stoner and members of his family owned all of the stock of Stoner Manufacturing, and that of Stoner Investments. Stoner Manufacturing had engaged in the manufacture of vending machines which dispensed candy, and as a part of the acquisition agreement it undertook to refrain from owning or managing any business engaged in the manufacture or sale of vending machines. Pursuant to an employment contract, respondent Harry Stoner was employed by petitioner as a consultant for five years at a salary of $50,000, and he agreed that during the term of his contract and for five years thereafter he would not

compete with petitioner in the business of manufacturing vending machines.

In 1965, petitioner sued respondents[1] in state court for breach of these noncompetition covenants. Shortly thereafter, respondents sued petitioner in the United States District Court for the Northern District of Illinois, complaining that petitioner had violated §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2. Respondents alleged that the covenants against competition were unreasonable restraints of trade because they were not reasonably limited as to time and place, and that the purpose of petitioner's state-court lawsuit was to "unlawfully harass" respondents and to "eliminate the competition" of respondents. App. 22, 25.

Respondents set up this federal antitrust claim as an affirmative defense to petitioner's state-court suit. *Id.*, at 31–32. However, prior to any ruling by the state courts on the merits of this defense, respondents voluntarily withdrew it. *Id.*, at 82.

The state-court litigation ran its protracted course,[2] includ-

---

[1] In addition to respondents Stoner and Stoner Manufacturing, petitioner also sued respondent Lektro-Vend Corp. Lektro-Vend had developed a radically new vending machine, and it was Stoner's relationship with Lektro-Vend that formed the basis of the lawsuit.

[2] The Court of Appeals' summary of the state-court litigation is illustrative:

"The suit was filed in Kane County, Illinois on August 10, 1965; the complaint charged breach of noncompetition covenants; an amended complaint also charged theft of trade secrets. After a bench trial the court on December 16, 1966 found for Vendo. Judgments against Stoner for $250,000 and against both defendants for $1,100,000 were granted. Stoner and Stoner Investments were enjoined from further acts of competition.

"An appeal was taken to the Appellate Court of Illinois. That court entered its decision on January 30, 1969, . . . 105 Ill. App. 2d 261, 245 N. E. 2d 263. The court held that no trade secrets were involved, the noncompetition covenants were valid and enforceable, and the covenants had been breached by the defendants. The grant of injunctive relief was affirmed. The court also held that though the trial court erred in striking

ing two trials, two appeals to the State Appellate Court, and an appeal to the Supreme Court of Illinois. In September 1974, the latter court affirmed a judgment in favor of petitioner and against respondents in an amount exceeding $7 million. *Vendo Co.* v. *Stoner,* 58 Ill. 2d 289, 321 N. E. 2d 1. The Supreme Court of Illinois predicated its judgment on its holding that Stoner had breached a fiduciary duty owed to petitioner, rather than upon any breach of the noncompetitive covenants.[3] This Court denied respondents' petition for a writ of certiorari. 420 U. S. 975 (1975).

During the entire nine-year course of the state-court litigation, respondents' antitrust suit in the District Court was, in the words of the Court of Appeals, allowed to lie "dormant." 545 F. 2d, at 1055. But the day after a Circuit Justice of this

---

the affirmative defense based on the federal antitrust laws, it was correct in denying the defense based on the Illinois antitrust laws. The cause was remanded for a determination of damages and further proceedings.

"Upon remand the defendant withdrew its affirmative defense asserted under the federal antitrust laws. The trial court, after hearing evidence, entered judgments against Stoner and Stoner Investments which totaled $7,363,500.

"Upon a second appeal to the Illinois Appellate Court, the court decided, on September 12, 1973, 13 Ill. App. 3d 291, 300 N. E. 2d 632, that the trial court erred in the measurement of damages. The case was remanded for assessment of damages in accordance with the Appellate Court's original opinion.

"Upon appeal to the Illinois Supreme Court on September 27, 1974, . . . 58 Ill. 2d 289, 321 N. E. 2d 1, the appellate court was reversed and the trial court's judgments were affirmed. The Supreme Court in deciding the case constructed a different theory of recovery—the breach of a fiduciary obligation on the part of Stoner—than had been asserted by Vendo." 545 F. 2d 1050, 1055 n. 4 (CA7 1976).

[3] "Quite apart from any liability which may be predicated upon a breach of the covenants against competition contained in the sales agreement and the employment contract, it is clear that Stoner violated his fiduciary duties to plaintiff during the period when he was a director and an officer of plaintiff." 58 Ill. 2d, at 303, 321 N. E. 2d, at 9.

Court had denied a stay of execution pending petition for certiorari to the Supreme Court of Illinois, respondents moved in the District Court for a preliminary injunction against collection of the Illinois judgment. The District Court in due course granted this motion.

That court found that it "appear[ed] that the [noncompetition] covenants . . . were overly broad," 403 F. Supp., at 533, and that there was "persuasive evidence that Vendo's activities in its litigation against the Stoner interests in Illinois state court were not a genuine attempt to use the adjudicative process legitimately." *Id.*, at 534–535. . Recognizing that there is a "paucity of authority" on the issue, *id.*, at 536, the District Court held that the injunctive-relief provision of the Clayton Act, 15 U. S. C. § 26, constitutes an express exception to 28 U. S. C. § 2283, the "Anti-Injunction Act." The court further found that collection efforts would eliminate two of the three plaintiffs and thus that the injunction was necessary to protect the jurisdiction of the court, within the meaning of that exception to § 2283.

The Court of Appeals affirmed, finding that § 16 of the Clayton Act was an express exception to § 2283. The court did not reach the issue of whether an injunction was necessary to protect the jurisdiction of the District Court.

In this Court, petitioner renews its contention that principles of equity, comity, and federalism, as well as the Anti-Injunction Act, barred the issuance of the injunction by the District Court. Petitioner also asserts in its brief on the merits that the United States District Court was required to give full faith and credit to the judgment entered by the Illinois courts.[4] Because we agree with petitioner that the District Court's order violated the Anti-Injunction Act, we reach none of its other contentions.

---

[4] This issue was not presented to this Court in the petition for certiorari, and the Court of Appeals did not discuss it in its opinion.

## III

The Anti-Injunction Act, 28 U. S. C. § 2283, provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The origins and development of the present Act, and of the statutes which preceded it, have been amply described in our prior opinions and need not be restated here. The most recent of these opinions are *Mitchum* v. *Foster,* 407 U. S. 225 (1972), and *Atlantic Coast Line R. Co.* v. *Locomotive Engineers,* 398 U. S. 281 (1970). Suffice it to say that the Act is an absolute prohibition against any injunction of any state-court proceedings, unless the injunction falls within one of the three specifically defined exceptions in the Act. The Act's purpose is to forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court. *Oklahōma Packing Co.* v. *Oklahoma Gas & Electric Co.,* 309 U. S. 4, 9 (1940). Respondents' principal contention is that, as the Court of Appeals held, § 16 of the Clayton Act, which authorizes a private action to redress violations of the antitrust laws, comes within the "expressly authorized" exception to § 2283.

We test this proposition mindful of our admonition that

"[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Atlantic Coast Line R. Co., supra,* at 297.

This cautious approach is mandated by the "explicit wording of § 2283" and the "fundamental principle of a dual system of

courts." *Ibid.* We have no occasion to construe the section more broadly:

> "[It is] clear beyond cavil that the prohibition is not to be whittled away by judicial improvisation." *Clothing Workers* v. *Richman Bros. Co.,* 348 U. S. 511, 514 (1955).

Our inquiry, of course, begins with the language of § 16 of the Clayton Act, which is the statute claimed to "expressly authorize" the injunction issued here. It provides, in pertinent part:

> "[A]ny person . . . shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ." 38 Stat. 737, 15 U. S. C. § 26.

On its face, the language merely authorizes private injunctive relief for antitrust violations. Not only does the statute not mention § 2283 or the enjoining of state-court proceedings, but the granting of injunctive relief under § 16 is by the terms of that section limited to "the same conditions and principles" employed by courts of equity, and by "the rules governing such proceedings." In 1793 the predecessor to § 2283 was enacted specifically to limit the general equity powers of a federal court. *Smith* v. *Apple,* 264 U. S. 274, 279 (1924); *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, 130 n. 2 (1941). When § 16 was enacted in 1914 the bar of the Anti-Injunction Act had long constrained the equitable power of federal courts to issue injunctions. Thus, on its face, § 16 is far from an express exception to the Anti-Injunction Act, and may be fairly read as virtually incorporating the prohibitions

of the Anti-Injunction Act with restrictive language not found, for example, in 42 U. S. C. § 1983. See discussion of *Mitchum* v. *Foster, infra.*

Respondents rely, as did the Court of Appeals and the District Court, on the following language from *Mitchum:*

> ". . . [I]t is clear that, in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding. This is not to say that in order to come within the exception an Act of Congress must, on its face and in every one of its provisions, be totally incompatible with the prohibition of the anti-injunction statute. *The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding."* 407 U. S., at 237–238. (Emphasis added, footnote omitted.)

But we think it is clear that neither this language from *Mitchum* nor *Mitchum's ratio decidendi* supports the result contended for by respondents.

The private action for damages conferred by the Clayton Act is a "uniquely federal right or remedy," in that actions based upon it may be brought only in the federal courts. See *General Investment Co.* v. *Lake Shore & Mich. So. R. Co.,* 260 U. S. 261, 287 (1922). It thus meets the first part of the test laid down in the language quoted from *Mitchum.*

But that authorization for private actions does not meet the second part of the *Mitchum* test; it is not an "Act of Congress . . . [which] could be given its intended scope only by the stay of a state court proceeding," 407 U. S., at 238. Crucial to our determination in *Mitchum* that 42 U. S. C.

§ 1983 fulfilled this requirement—but wholly lacking here— was our recognition that one of the clear congressional concerns underlying the enactment of § 1983 was the possibility that state courts, as well as other branches of state government, might be used as instruments to deny citizens their rights under the Federal Constitution. This determination was based on our review of the legislative history of § 1983; similar review of the legislative history underlying § 16 demonstrates that that section does not meet this aspect of the *Mitchum* test.

Section 1983 on its face, of course, contains no reference to § 2283, nor does it expressly authorize injunctions against state-court proceedings. But, as *Mitchum* recognized, such language need not invariably be present in order for a statute to come within the "expressly authorized" exception if there exists sufficient evidence in the legislative history demonstrating that Congress recognized and intended the statute to authorize injunction of state-court proceedings. In Part IV of our opinion in *Mitchum* we examined *in extenso* the purpose and legislative history underlying § 1983, originally § 1 of the Civil Rights Act of 1871. We recounted in detail that statute's history which made it abundantly clear that by its enactment Congress demonstrated its direct and explicit concern to make the federal courts available to protect civil rights against unconstitutional actions of state courts. We summarized our conclusion in these words:

> "This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." 407 U. S., at 242.

Thus, in *Mitchum,* absence of express language authorization for enjoining state-court proceedings in § 1983 actions was cured by the presence of relevant legislative history. In this case, however, neither the respondents nor the courts below have called to our attention any similar legislative history in connection with the enactment of § 16 of the Clayton Act. It is not suggested that Congress was concerned with the possibility that state-court proceedings would be used to violate the Sherman or Clayton Acts. Indeed, it seems safe to say that of the many and varied anticompetitive schemes which § 16 was intended to combat, Congress in no way focused upon a scheme using litigation in the state courts. The relevant legislative history of § 16 simply suggests that in enacting § 16 Congress was interested in extending the right to enjoin antitrust violations to private citizens.[5]

---

[5] Prior to the enactment of § 16, private injunctive relief was not authorized for antitrust violations. *Paine Lumber Co.* v. *Neal,* 244 U. S. 459 (1917). As far as the legislative history indicates, the sole purpose of § 16 (§ 14 in the original drafts) was to extend to private parties the right to sue for injunctive relief. The following passage, taken in its entirety from H. R. Rep. No. 627, 63d Cong., 2d Sess., 21 (1914), demonstrates what Congress had in mind in enacting § 16:

"Section 14 authorizes a person, firm, or corporation or association to sue for and have injunctive relief against threatened loss or damage by a violation of the antitrust laws, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings. Under section 7 of the act of July 2, 1890, a person injured in his business and property by corporations or combinations acting in violation of the Sherman antitrust law, may recover loss and damage for such wrongful act. There is, however, no provision in the existing law authorizing a person, firm, corporation, or association to enjoin threatened loss or damage to his business or property by the commission of such unlawful acts, and the purpose of this section is to remedy such defect in the law. This provision is in keeping with the recommendation made by the President in his message to Congress on the subject of trusts and monopolies."

See also S. Rep. No. 698, 63d Cong., 2d Sess., 17–18 (1914).

The critical aspects of the legislative history recounted in *Mitchum* which led us to conclude that § 1983 was within the "expressly authorized" exception to § 2283 are wholly absent from the relevant history of § 16 of the Clayton Act. This void is not filled by other evidence of congressional authorization.

Section 16 undoubtedly embodies congressional policy favoring private enforcement of the antitrust laws, and undoubtedly there exists a strong national interest in antitrust enforcement.[6] However, contrary to certain language in the opinion

---

[6] In *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972), this Court held that harassing and sham state-court proceedings of a repetitive nature could be part of an anticompetitive scheme or conspiracy. In *Otter Tail Power Co.* v. *United States,* 410 U. S. 366 (1973), one of the allegations was that the federal-court defendant had instituted and supported state-court litigation for anticompetitive purposes in violation of the antitrust laws. The District Court had enjoined the defendant from "[i]nstituting, supporting or engaging in litigation, directly or indirectly, against cities and towns, and officials thereof, which have voted to establish municipal power systems . . . ." Jurisdictional Statement, O. T. 1972, No. 71–991, p. A–115. This Court vacated and remanded to the District Court for consideration, in light of the intervening decision of *California Motor Transport,* of whether the state-court litigation came within the "mere sham" exception announced in *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961). Those cases together may be cited for the proposition that repetitive, sham litigation in state courts may constitute an antitrust violation and that an injunction may lie to enjoin future state-court litigation. However, neither of those cases involved the injunction of a pending state-court proceeding, and thus the bar of § 2283 was not brought into play.

Nothing that we say today cuts back in any way on the holdings of these two cases; what we must here decide is whether such a lawsuit may be enjoined by a federal court *after* it has been commenced, notwithstanding the bar of the Anti-Injunction Act. While we conclude that it may not, nothing in our opinion today prevents a federal court in the proper exercise of its jurisdiction from enjoining the commencement of additional state-court proceedings if it concludes from the course and outcome of the first one that such proceedings would constitute a violation of the anti-

of the District Court, 403 F. Supp., at 536, the importance of the federal policy to be "protected" by the injunction is not the focus of the inquiry. Presumptively, all federal policies enacted into law by Congress are important, and there will undoubtedly arise particular situations in which a particular policy would be fostered by the granting of an injunction against a pending state-court action. If we were to accept respondents' contention that § 16 could be given its "intended scope" only by allowing such injunctions, then § 2283 would be completely eviscerated since the ultimate logic of this position can mean no less than that virtually *all* federal statutes [7] authorizing injunctive relief are exceptions to § 2283. Cer-

trust laws. With respect to this future litigation, the injunction will prevent even the commencement of a second such action, and the principles of federalism do not require the bar of § 2283. This distinction is totally consistent with the realization that the true bona fides of the initial state-court litigation is often not apparent:

"One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." *California Motor Transport, supra,* at 513.

Any "disadvantage" to which the federal plaintiff is put in the initial proceeding is diminished by his ability to set up the federal antitrust claim as an affirmative defense, reviewable by this Court under 28 U. S. C. § 1257 (3), and his ability to sue for treble damages resulting from the vexatious prosecution of that state-court litigation.

[7] Petitioner has catalogued the following federal statutes, and suggests that each would be so affected:

"E. g., 7 U. S. C. § 216 (§ 315 of the Packers and Stockyards Act of 1921); 7 U. S. C. § 2050a (Farm Labor Contractor Registration Act); 7 U. S. C. § 2305 (a) (§ 6 of the Agricultural Fair Practices Act of 1967); 12 U. S. C. § 1731b (i) (§ 513 of the National Housing Act); 12 U. S. C. § 1976 (Bank Holding Company Act); 15 U. S. C. § 78aa (Securities Exchange Act of 1934); 15 U. S. C. § 298 (relating to the false stamping of gold and silver); 15 U. S. C. § 433 (providing for suits by farmer's cooperative associations against discrimination by boards of trade); 15 U. S. C. §§ 1114 (2), 1116, 1121 (providing for injunctive relief against trademark infringement); 15 U. S. C. § 2073 (Consumer Product Safety Act); 15 U. S. C. § 2102 (Hobby Protection Act); 17 U. S. C. § 112 (providing for

tainly all federal injunctive statutes are enacted to provide for the suspension of activities antithetical to the federal policies underlying the injunctive statute or related statutes. If the injunction would issue under the general rules of equity practice—requiring, *inter alia,* a showing of irreparable injury—but for the bar of § 2283, then clearly § 2283 in some sense may be viewed as frustrating or restricting federal policy since the activity inconsistent with the federal policy may not be enjoined because of § 2283's bar.[8]   Thus, were we to accede

---

injunctions against violation of any right secured by the copyright laws); 26 U. S. C. § 9011 (b) (Presidential Election Campaign Fund Act); 29 U. S. C. § 412 (Labor-Management Reporting and Disclosure Act); 42 U. S. C. § 2000e-5 (Title VII (Equal Employment Opportunities) of the Civil Rights Act of 1964); 42 U. S. C. §§ 6305, 6395 (e) (Energy Policy and Conservation Act); 45 U. S. C. § 547 (Title III of the Rail Passenger Service Act of 1970); 49 U. S. C. §§ 1 (20), 322 (b) (2), 916, 1017 (b) (Interstate Commerce Act); 49 U. S. C. § 1487 (a) (Federal Aviation Act).   See also 16 U. S. C. § 1540 (g) (Endangered Species Act of 1973); 33 U. S. C. § 1365 (Federal Water Pollution Control Act); 33 U. S. C. § 1415 (g) (Marine Protection, Research, and Sanctuaries Act of 1972); 33 U. S. C. § 1515 (Deepwater Ports Act of 1974); 42 U. S. C. § 300j-8 (Safe Drinking Water Act); 42 U. S. C. § 1857h-2 (Clean Air Act); 42 U. S. C. § 4911 (Noise Control Act of 1972)."   Reply Brief for Petitioner 10–11, n. 7.

[8] MR. JUSTICE STEVENS in his dissent, see *post,* at 649–654, would conclude that since certain types of state-court litigation may violate the antitrust laws, an injunction of such litigation while pending is "expressly authorized" under the provisions of the Anti-Injunction Act.   But this conclusion does not at all follow from the premise that judicial decisions have construed the prohibition of the antitrust laws to include sham and frivolous state-court proceedings—a premise with which we do not at all disagree, see n. 6, *supra.*   The conclusion is supportable only as a matter of policy preference, and not of statutory construction.   Under MR. JUSTICE STEVENS' view, all a federal court need do is find a violation of the federal statute, then by the very force of that finding "express authorization" for the statute would be presumed.   But this approach flies in the face of our past decisions.   For example, in *Mitchum* v. *Foster,* 407 U. S. 225, 227 (1972), the petitioner had alleged that the state courts "were depriving him of rights protected by the First and Fourteenth

to respondent's interpretation of the "intended scope" language, an exception to § 2283 would always be found to be "necessary" to give the injunctive Act its full intended scope, and § 2283 would place no additional limitation on the right

Amendments." Under MR. JUSTICE STEVENS' syllogistic formulation, since the state-court action is a violation of § 1983, the express authorization would be readily found on the face of the statute. However, the Court in *Mitchum* found no such *ipso facto* shortcut to the explicit prohibition of § 2283, but resorted to careful analysis of the legislative history in order to find evidence of congressional authorization. In short, MR. JUSTICE STEVENS' approach, which removes the bar of § 2283 from all federal injunctive statutes, is totally inconsistent with this Court's longstanding recognition that "[l]egislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions." *Clothing Workers* v. *Richman Bros. Co.*, 348 U. S. 511, 516 (1955).

In reaching this conclusion, MR. JUSTICE STEVENS argues that the Anti-Injunction Act should be "considered wholly inapplicable to later enacted federal statutes that are enforceable exclusively in federal litigation." *Post*, at 659. But this view is inconsistent with the approach adopted by the Court in *Clothing Workers, supra*. In that case, an employer had sought an injunction against a union in state court. This Court found that the action before the state court was "outside state authority," 348 U. S., at 514, and that jurisdiction was vested solely in the National Labor Relations Board. But the Court found that the exclusive federal jurisdiction was not sufficient to render § 2283 inapplicable. See also *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281 (1970).

We think MR. JUSTICE STEVENS' view tends to confuse the jurisdiction granted to federal courts by § 16 of the Clayton Act with the separate question of whether a court having such jurisdiction has also been "expressly authorize[d]" to enjoin state-court proceedings. *Post*, at 650–654. But the question of whether an injunction against state-court proceedings has been "expressly authorized" under § 2283 never arises unless the federal court asked to issue the injunction has subject-matter jurisdiction of the case in which the injunction is sought. Here the District Court is entirely free to proceed with the litigation on the merits of respondents' antitrust claim against petitioner, and to grant damages and such other relief as may be appropriate if it determines the issues in favor of respondents. All that we conclude is that it may not include as a part of that relief an injunction against an already pending state-court proceeding.

to enjoin state proceedings. The Anti-Injunction Act, a fixture in federal law since 1793, would then be a virtual dead letter whenever the plaintiff seeks an injunction under a federal injunctive statute. Whether or not the state proceeding could be enjoined would rest solely upon the traditional principles of equity and comity. However, as we emphasized in *Mitchum,* 407 U. S., at 243, the prohibitions of § 2283 exist separate and apart from these traditional principles, and we cannot read the "intended scope" language as rendering this specific and longstanding statutory provision inoperative simply because important federal policies are fostered by the statute under which the injunction is sought. Congress itself has found that these policies, in the ordinary case, must give way to the policies underlying § 2283. Given the clear prohibition of § 2283, the courts will not sit to balance and weigh the importance of various federal policies in seeking to determine which are sufficiently important to override historical concepts of federalism underlying § 2283; by the statutory scheme it has enacted, Congress has clearly reserved this judgment unto itself.[9]

---

[9] Much of MR. JUSTICE STEVENS' dissenting opinion is an able brief for the conceded importance of the Sherman and Clayton Acts. But however persuasive it might be in inducing Congress to lift the bar of § 2283 with respect to injunctions issued under § 16, we do not believe it is persuasive in determining whether, under the present state of the law, Congress has in fact "expressly authorized" the injunction issued by the District Court here. For example, MR. JUSTICE STEVENS laments that state-court proceedings may now become the vehicles by which an antitrust violator may put one independent businessman after another out of business. See *post,* at 652–654, 657. Federal courts are able to enjoin future repetitive litigation, see discussion of *California Motor Transport* and *Otter Tail Power, supra,* n. 6. But even if one were to agree with this broad speculation, the solution is simple and straightforward. If Congress determines that the use of state-court proceedings to foster anticompetitive schemes is of sufficient gravity, it may simply conclude that the need for greater antitrust enforcement outweighs the need to prevent

Our conclusion that the "importance," or the potential restriction in scope, of the federal injunction statute does not control for § 2283 purposes is consistent with the analysis of those very few statutes which we have in the past held to be exceptions to the Anti-Injunction Act. See *Mitchum, supra,* at 234–235, and nn. 12–16. The original version of the Anti-Injunction Act itself was amended in 1874 to allow federal courts to enjoin state-court proceedings which interfere with the administration of a federal bankruptcy proceeding. Rev. Stat. § 720. The Interpleader Act of 1926, 28 U. S. C. § 2361, the Frazier-Lemke Act, 11 U. S. C. § 203 (1940 ed.), and the Federal Habeas Corpus Act, 28 U. S. C. § 2251, while not directly referring to § 2283, have nonetheless explicitly authorized injunctive relief against state-court proceedings. The Act of 1851 limiting liability of shipowners, 46 U. S. C. § 185, provided that, after deposit of certain funds in the court by the shipowner, "all claims and proceedings against the owner with respect to the matter in question shall cease." The statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings. 28 U. S. C. § 1446 (e).

By limiting the statutory exceptions of § 2283 and its predecessors to these few instances, we have clearly recognized that the Act countenancing the federal injunction must neces-

friction in our federal system and amend § 16 to expressly authorize an injunction of state-court proceedings.

No desire for more vigorous antitrust enforcement should cause us to lose sight of our role as judges in interpreting the explicit command of a congressional statute; for notwithstanding the rhetoric of the dissenting opinion, the conclusion that §16 is an "expressly authorized" exception to § 2283 is no more than an *ipse dixit.* The "explicit wording of § 2283," *Atlantic Coast Line R. Co., supra,* at 297, is lost on the dissent; the dissent's approach is the clearest form of judicial improvisation which the Court counseled against in *Clothing Workers* v. *Richman Bros. Co., supra,* at 514.

sarily interact with, or focus upon, a state judicial proceeding.[10] Section 16 of the Clayton Act, which does not by its very essence contemplate or envision any necessary interaction with state judicial proceedings, is clearly not such an Act.

## IV

Although the Court of Appeals did not reach the issue, the District Court found that, in addition to being "expressly authorized," the injunction was "necessary in aid of its jurisdiction," a separate exception to § 2283. The rationale of the District Court was as follows:

> "The Court also holds that § 2283 authorizes an injunction here because further collection efforts would eliminate two plaintiffs, Stoner Investments and Lektro-Vend Corp., as parties under the case or controversy provisions of Article III since they would necessarily be controlled by Vendo. Vendo's offer to place the Stoner Investment and Lektro-Vend stock under control of the Court does not meet this problem because as a matter of substance Vendo would control both plaintiff and defendant, requiring dismissal under Article III. Thus the injunction is also necessary to protect the jurisdiction of the Court." 403 F. Supp., at 536–537.

In *Toucey* v. *New York Life Ins. Co.*, 314 U. S., at 134–135, we acknowledged the existence of a historical exception to the Anti-Injunction Act in cases where the federal court has obtained jurisdiction over the *res,* prior to the state-court action. Although the "necessary in aid of" exception to § 2283 may be fairly read as incorporating this historical *in rem* exception, see C. Wright, Federal Courts § 47, p. 204 (3d ed. 1976), the federal and state actions here are simply *in per-*

---

[10] A possible exception is *Porter* v. *Dicken,* 328 U. S. 252 (1946), regarding § 205 (a) of the Emergency Price Control Act of 1942. This Act, enacted in response to wartime exigencies, expired in 1947.

*sonam.* The traditional notion is that *in personam* actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the exception to § 2283 was intended to alter this balance. We have never viewed parallel *in personam* actions as interfering with the jurisdiction of either court; as we stated in *Kline* v. *Burke Construction Co.,* 260 U. S. 226 (1922):

> "[A]n action brought to enforce [a personal liability] *does not tend to impair or defeat the jurisdiction* of the court in which a prior action for the same cause is pending. Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of *res adjudicata* . . . ." *Id.,* at 230 (emphasis added).

No case of this Court has ever held that an injunction to "preserve" a case or controversy fits within the "necessary in aid of its jurisdiction" exception; neither have the parties directed us to any other federal-court decisions so holding.

The District Court's legal conclusion is not only unsupported by precedent, but the factual premises upon which it rests are not persuasive. First, even if the two corporate plaintiffs would cease to litigate the case after execution of the state-court judgment, there is no indication that Harry Stoner himself would lose his standing to vindicate his rights, or that the case could not go forward. Nor does it appear that the two corporate plaintiffs would necessarily be removed from the lawsuit. As far as the record indicates, there are currently minority shareholders in those corporations whose ownership interests would not be affected by petitioner's acquisition of majority stock control of the corporations. Under the applicable rules for shareholder derivative actions,

see Fed. Rule Civ. Proc. 23.1, the shareholders could presumably pursue the corporate rights of action, which would inure to their benefit, even if the corporations themselves chose not to do so. Finally, petitioner offered to enter a consent decree which assuredly would eliminate any possibility of petitioner's acquiring control of the corporations. See App. 209–210, 258. The injunction in this case was therefore, even under the District Courts' legal theory, not *necessary* in aid of that court's jurisdiction.

Our conclusion that neither of the bases relied upon by the District Court constitutes an exception to § 2283 is more than consistent with the recognition that any doubt must be resolved *against* the finding of an exception to § 2283, *Atlantic Coast Line R. Co.*, 398 U. S., at 297; a holding that there is an exception present in this case would demonstrably involve "judicial improvisation." *Clothing Workers*, 348 U. S., at 514.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring in the result.

Although I agree that the decision of the Court of Appeals should be reversed, I do so for reasons that differ significantly from those expressed by the plurality. According to the plurality's analysis, § 16 of the Clayton Act, 15 U. S. C. § 26, is not an expressly authorized exception to the Anti-Injunction Act, 28 U. S. C. § 2283, because it is not "an 'Act of Congress . . . [which] could be given its intended scope only by the stay of a state-court proceeding,' [*Mitchum* v. *Foster*, 407 U. S. 225, 238 (1972)]." *Ante*, at 632. I do not agree that this is invariably the case; since I am of the opinion, however, that the state-court proceeding in this case should not have been enjoined by the federal court, I concur in the result.

In my opinion, application of the *Mitchum* test for deciding whether a statute is an "expressly authorized" exception to the Anti-Injunction Act shows that § 16 is such an exception

under narrowly limited circumstances. Nevertheless, consistently with the decision in *California Motor Transport Co. v. Trucking Unlimited,* 404 U. S. 508 (1972),* I would hold that no injunction may issue against currently pending state-court proceedings unless those proceedings are themselves part of a "pattern of baseless, repetitive claims" that are being used as an anticompetitive device, all the traditional prerequisites for equitable relief are satisfied, and the only way to give the antitrust laws their intended scope is by staying the state proceedings. Cf. *California Motor Transport Co. v. Trucking*

---

*I cannot agree with MR. JUSTICE STEVENS, *post,* at 661–662, that the examples given in the quoted portion of *California Motor Transport Co. v. Trucking Unlimited* necessarily involve the use of the adjudicatory process in the same way that the state courts were being used in this case. For example, there is no reason to believe that the Court's reference to the use of a patent obtained by fraud to exclude a competitor contemplated only one lawsuit. The case cited in connection with that reference, *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U. S. 172 (1965), held only that the enforcement of a patent procured by fraud on the Patent Office could state a claim under § 2 of the Sherman Act, where the monopolistic acts alleged included use of the fraudulent patent through a course of action involving both threats of suit and prosecution of an infringement suit.

MR. JUSTICE STEVENS' quotation from *California Motor Transport* stops just short of the language that I consider critical to the instant case. The Court's opinion continues:

"Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw." 404 U. S., at 513.

Since I believe that federal courts should be hesitant indeed to enjoin ongoing state-court proceedings, I am of the opinion that a pattern of baseless, repetitive claims or some equivalent showing of grave abuse of the state courts must exist before an injunction would be proper. No such finding was made by the District Court in this case.

*Unlimited,* 404 U. S., at 513. See also *Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 380 (1973).

In my view, the District Court failed properly to apply the *California Motor Transport* rule. The court believed that it was enough that Vendo's activities in the single state-court proceeding involved in this case were not genuine attempts to use the state adjudicative process legitimately. In reaching this conclusion, the court looked to Vendo's purpose in conducting the state litigation and to several negative consequences that the litigation had for respondents. The court, however, did not find a "pattern of baseless, repetitive claims," nor could it have done so under the circumstances. Only one state-court proceeding was involved in this case, and it resulted in the considered affirmance by the Illinois Supreme Court of a judgment for more than $7 million. In my opinion, therefore, it cannot be said on this record that Vendo was using the state-court proceeding as an anticompetitive device in and of itself. Thus, I believe that § 16 itself did not authorize the injunction below, and on this ground I would reverse.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, dissenting.

Quite properly, the plurality does not question the merits of the preliminary injunction entered by the United States District Court for the Northern District of Illinois staying proceedings in the Illinois courts. It was predicated on appropriate findings of fact,[1] it was entered by a District Judge whose

---

[1] Specific findings of likelihood of ultimate success on the merits, likelihood of irreparable harm, a balance of the equities in favor of respondent-movants, and of protection of the public interest by issuance of the injunction are recited and substantiated in the District Court opinion. 403 F. Supp. 527, 532–538 (1975). The Court of Appeals affirmed, specifically rejecting petitioner's attack on the finding of a likelihood of ultimate success on the merits. 545 F. 2d 1050, 1058–1059 (CA7 1976).

understanding of the federal antitrust laws was unique,[2] and its entry was affirmed unanimously by the Court of Appeals.

Judge McLaren found substantial evidence that petitioner intended to monopolize the relevant market; that one of the overt acts performed in furtherance thereof was the use of litigation as a method of harassing and eliminating competition; that two of the corporate plaintiffs in the case, respondents here, would be eliminated by collection of the Illinois judgment; and that the state litigation had already severely hampered, and collection of the judgment would prevent, the marketing of a promising, newly developed machine which would compete with petitioner's products. 403 F. Supp. 527, 534–535, 538 (1975).[3] The Court of Appeals implicitly endorsed these findings when it noted that "[h]ere Vendo seeks to thwart a federal antitrust suit by the enforcement of state court judgments which are alleged to be the very object of antitrust violations." 545 F. 2d 1050, 1057 (CA7 1976).

The question which is therefore presented is whether the

---

[2] The late Richard W. McLaren served as Assistant Attorney General in charge of the Antitrust Division of the Department of Justice from 1969 until his appointment to the bench in 1972. In private practice he had acted as Chairman of the Antitrust Section of the American Bar Association.

[3] It is well settled, and the District Court so held, that when the precise conduct proscribed by the antitrust laws is sought to be furthered by litigation, the antitrust laws forbid a court from giving judgment if to do so "would be to make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." *Kelly* v. *Kosuga,* 358 U. S. 516, 520. See 403 F. Supp., at 535, citing *Continental Wall Paper Co.* v. *Louis Voight & Sons,* 212 U. S. 227, 261. See *Response of Carolina* v. *Leasco Response, Inc.,* 498 F. 2d 314, 317–320 (CA5 1974), cert. denied, 419 U. S. 1050; *Milsen Co.* v. *Southland Corp.,* 454 F. 2d 363 (CA7 1971); *Helfenbein* v. *International Industries, Inc.,* 438 F. 2d 1068, 1071 (CA8 1971); *Farbenfabriken Bayer, A. G.* v. *Sterling Drug, Inc.,* 307 F. 2d 207 (CA3 1962); *Tampa Electric Co.* v. *Nashville Coal Co.,* 276 F. 2d 766 (CA6 1960); *United States* v. *Bayer Co.,* 135 F. Supp. 65 (SDNY 1955).

anti-injunction statute [4] deprives the federal courts of power to stay state-court litigation which is being prosecuted in direct violation of the Sherman Act. I cannot believe that any of the members of Congress who unanimously enacted that basic charter of economic freedom [5] in 1890 would have answered that question the way the plurality does today.

## I

The plurality relies on the present form of a provision of the Judiciary Act of 1793.[6] In the ensuing century, there were changes in our economy which persuaded the Congress that the state courts could not adequately deal with contracts in restraint of trade that affected commerce in more than one

---

[4] "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U. S. C. § 2283.

[5] "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 4.

"The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape. The restrictions the Act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce." *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 359–360.

[6] Act of Mar. 2, 1793, § 5, 1 Stat. 335: "[N]or shall a writ of injunction be granted to stay proceedings in any court of a state . . . ." For convenience, the plurality has referred to this clause as the "Anti-Injunction Act"; that, however, is not the proper name of the statute.

jurisdiction.[7]   The Sherman Act was enacted virtually unani-mously in 1890 to protect the national economy from the perni-cious effects of regulation by private cartel and to vest the fed-

[7] In his first speech in support of his bill, Senator Sherman stated:

"The power of the State courts has been repeatedly exercised to set aside such combinations as I shall hereafter show, but these courts are limited in their jurisdiction to the State, and, in our complex system of govern-ment, are admitted to be unable to deal with the great evil that now threatens us.

". . . The purpose of this bill is to enable the courts of the United States to apply the same remedies against combinations which injuriously affect the interests of the United States that have been applied in the several States to protect local interests.

. . . . .

". . . The committee therefore deemed it proper by express legislation to confer on the circuit courts of the United States original jurisdiction of all suits of a civil nature at common law or in equity arising under this section, with authority to issue all remedial process or writs proper and necessary to enforce its provisions . . . ." 21 Cong. Rec. 2456 (1890). Later the same day he said:

"[Congress] may 'regulate commerce;' can it not protect commerce, nullify contracts that restrain commerce, turn it from its natural courses, increase the price of articles, and therefore diminish the amount of commerce?

. . . . .

"[The power of the 'combinations'] for mischief will be greatly crip-pled by this bill. Their present plan of organization was adopted only to evade the jurisdiction of State courts.

. . . . .

"Suppose one of these combinations should unite all, or nearly all, the domestic producers of an article of prime necessity with a view to prevent competition and to keep the price up to the foreign cost and duty added, would not this be in restraint of trade and commerce and affect injuriously the operation of our revenue laws?   Can Congress prescribe no remedy except to repeal its taxes?   Surely it may au-thorize the executive authorities to appeal to the courts of the United States for such a remedy, as courts habitually apply in the States for the forfeiture of charters thus abused and the punishment of officers

eral courts with jurisdiction adequate to "exert such remedies as would fully accomplish the purposes intended." [8]

Between 1890 and 1914, although private litigants could

---

who practice such wrongs to the public. It may also give to our citizens the right to sue for such damages as they have suffered." *Id.*, at 2462.

Senator Sherman, 3 days later, discussing the rise of the "combinations" during the preceding 20 years, stated:

". . . The State courts have attempted to wrestle with this difficulty. I produced decisions of the supreme courts of several of the States.

"Take the State of New York, where the sugar trust was composed of seventeen corporations. What remedy had the people of New York in the suit that they had against that combination? None whatever, except as against one corporation out of the seventeen. No proceeding could be instituted in the State of New York by which all those corporations could be brought in one suit under the common jurisdiction of the United States. No remedy could be extended by the courts, although they were eager and earnest in search of a remedy.

.        .        .        .        .

". . . When a man is injured by an unlawful combination why should he not have the power to sue in the courts of the United States? It would not answer to send him to a State court. It would not answer at all to send him to a court of limited jurisdiction. Then, besides, it is a court of the United States that alone has jurisdiction over all parts of the United States. The United States can send its writs into every part of a State and make parties in different States submit to its process. The States can not do that." *Id.*, at 2568–2569.

Similarly, in the House debate Congressman Culberson, floor sponsor of the bill, had this to say during his introductory remarks:

"If Congress will legislate within its sphere and to the limit to which it may go, and if the legislatures of the several States will do their duty and supplement that legislation, the trusts and combinations which are devouring the substance of the people of the country may be effectually suppressed. The States are powerless unless Congress will take charge of the trade between the States and make unlawful traffic that operates in restraint of trade and which promotes and encourages monopoly." *Id.*, at 4091.

See Letwin, Congress and the Sherman Antitrust Law: 1887–1890, 23 U. Chi. L. Rev. 221 (1956).

[8] "[F]ounded upon broad conceptions of public policy, the prohibi-

recover treble damages, only the United States could invoke the jurisdiction of the federal courts to prevent and restrain violations of the Sherman Act.[9] When Congress authorized the federal courts to grant injunctive relief in private antitrust litigation, it conferred the same broad powers that the courts possess in cases brought by the Government.[10] Section

---

tions of the statute were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibitions of the statute but the remedies which it provided were co-extensive with such conceptions. . . . [T]he statute in express terms vested the Circuit Court[s] of the United States with 'jurisdiction to prevent and restrain violations of this act,' and besides expressly conferred the amplest discretion in such courts to join such parties as might be deemed necessary and to exert such remedies as would fully accomplish the purposes intended." *Wilder Mfg. Co. v. Corn Products Co.*, 236 U. S. 165, 174.

See *Northern Securities Co. v. United States*, 193 U. S. 197, 343–347, 349–350 (opinion of Harlan, J.).

[9] Section 4 of the Sherman Act authorized equitable relief in actions brought by· United States Attorneys; § 7 authorized any person injured in his business or property by reason of a violation of the antitrust laws to recover treble damages. 26 Stat. 209–210. In both sections, as is true of § 16 of the Clayton Act, the scope of the court's jurisdiction is limited only by the need to establish a violation of the Act.

[10] Although the kind of relief which is appropriate in private litigation may sometimes be different from that which the Government may obtain, cf. *United States v. Borden Co.*, 347 U. S. 514, 518–520, there is no difference in the scope of the jurisdictional grant to the federal court in the two kinds of cases:

"[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws. *E. g., United States v. Borden Co.*, 347 U. S. 514, 518 (1954). Section 16 should be construed and applied with this purpose in mind . . . . Its availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect.' [*Hecht Co. v. Bowles*, 321 U. S. 321, 330.]" *Zenith Corp. v. Hazeltine*, 395 U. S. 100, 130–131.

16 of the Clayton Act expressly authorizes injunctions against "a violation of the antitrust laws." [11]

The scope of the jurisdictional grant is just as broad as the definition of a violation of the antitrust laws. That definition was deliberately phrased in general language to be sure that "every conceivable act which could possibly come within

---

[11] Section 16 provides:

"[A]ny person . . . shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ." 38 Stat. 737, 15 U. S. C. § 26.

The legislative history of § 16 is thin. In addition to the nearly identical House and Senate Reports, *ante*, at 634 n. 5, the following comments from the House debate provide some idea of the congressional intent. Congressman McGillicuddy, a member of the Commerce Committee, described the perceived need:

"Under the present law any person injured in his business or property by acts in violation of the Sherman antitrust law may recover his damage. . . . There is no provision under the present law, however, to prevent threatened loss or damage even though it be irreparable. The practical effect of this is that a man would have to sit by and see his business ruined before he could take advantage of his remedy. In what condition is such a man to take up a long and costly lawsuit to defend his rights?

"The proposed bill solves this problem for the person, firm, or corporation threatened with loss or damage to property by providing injunctive relief against the threatened act that will cause such loss or damage. Under this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy." 51 Cong. Rec. 9261 (1914).

During consideration of the Conference Report Congressman Floyd described the scope of the § 16 remedy:

"[S]o that if a man is injured by a discriminatory contract, by a tying contract, by the unlawful acquisition of stock of competing corporations, or by reason of someone acting unlawfully as a director in two banks or other corporations, he can go into any court and enjoin or restrain the party from committing such unlawful acts." *Id.*, at 16319.

the spirit or purpose of the prohibition" would be covered by the statute, regardless of whether or not the particular form of restraint was actually foreseen by Congress.[12] In the decades following the formulation of the Rule of Reason in 1911, this Court has made it perfectly clear that the prosecution of litigation in a state court may itself constitute a form of violation of the federal statute.

Thus, the attempt to enforce a patent obtained by fraud,[13] or a patent known to be invalid for other reasons,[14] may constitute an independent violation of the Sherman Act; and such litigation may be brought in a state court.[15] The prosecution of frivolous claims and objections before regulatory bodies, including state agencies, may violate the antitrust laws.[16] The enforcement of restrictive provisions in a license to use a patent or a trademark [17] may violate the Sherman Act; such enforcement may, of course, be sought in the state courts. Similarly, the provisions of a lease,[18] or a fair trade

---

[12] "[T]he generic designation of the first and second sections of the [Sherman Act], when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed. That is to say, it was held [in *Standard Oil Co.* v. *United States*, 221 U. S. 1,] that in view of the general language of the statute and the public policy which it manifested, there was no possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape by any indirection the prohibitions of the statute." *United States* v. *American Tobacco Co.*, 221 U. S. 106, 181.

[13] *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172.

[14] *MacGregor* v. *Westinghouse Co.*, 329 U. S. 402.

[15] *Pratt* v. *Paris Gas Light & Coke Co.*, 168 U. S. 255, 260.

[16] *Otter Tail Power Co.* v. *United States*, 410 U. S. 366; 417 U. S. 901 (summary affirmance after remand); *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508.

[17] *Timken Co.* v. *United States*, 341 U. S. 593; *Farbenfabriken Bayer, A. G.* v. *Sterling Drug, Inc.*, 307 F. 2d 207 (CA3 1962); *Gray Line, Inc.* v. *Gray Line Sightseeing Cos.*, 246 F. Supp. 495 (ND Cal. 1965).

[18] *International Salt Co.* v. *United States*, 332 U. S. 392; *United*

agreement,[19] may become the focus of enforcement litigation which has a purpose or effect of frustrating rights guaranteed by the antitrust laws, either in a state or federal court.[20] Indeed, the enforcement of a covenant not to compete—the classic example of a contract in restraint of trade—typically takes place in a state court.[21]

These examples are sufficient to demonstrate that "litigation in state courts may constitute an antitrust violation . . . ." *ante*, at 635 n. 6. Since the judicial construction of a statute is as much a part of the law as the words written by the legislature, the illegal use of state-court litigation as a method of monopolizing or restraining trade is as plainly a violation of the antitrust laws as if Congress had specifically described each of the foregoing cases as an independent

---

*Shoe Machinery Corp.* v. *United States*, 258 U. S. 451; *Phillips* v. *Crown Central Petroleum Corp.*, 376 F. Supp. 1250 (Md. 1973).

[19] *Janel Sales Corp.* v. *Lanvin Parfums, Inc.*, 396 F. 2d 398 (CA2 1968), cert. denied, 393 U. S. 938; *Katz Drug Co.* v. *W. A. Sheaffer Pen Co.*, 6 F. Supp. 212 (WD Mo. 1933).

[20] In litigation between a franchisee and a franchisor the former may challenge the validity of various contract provisions under federal law, while the latter may rely heavily on state contract law as a basis for controlling the franchisee's conduct. State proceedings to obtain possession of disputed premises or equipment are powerful weapons in such litigation, even when the federal court has the power to maintain the status quo. See *Chmieleski* v. *City Products Corp.*, 71 F. R. D. 118, 141–142, 158 (WD Mo. 1976).

[21] The potential consequences of the plurality's view may perhaps best be illustrated by reference to a common-law decision that could not possibly survive scrutiny under the Sherman Act. In *Nordenfelt* v. *Maxim Nordenfelt Guns & Ammunition Co.*, [1894] A. C. 535, the House of Lords held that a 25-year, worldwide covenant not to compete in the arms business was an enforceable bargain. One of the parties to such a contract was therefore entitled to enjoin a breach of the agreement by another party. If such common-law relief should be granted by a state court in a comparable situation, and if the plurality's interpretation of the statute were accepted, a federal court would be powerless to interfere with state proceedings to enforce such a judgment.

violation. The language in § 16 of the Clayton Act which expressly authorizes injunctions against violations of the antitrust laws is therefore applicable to this species of violation as well as to other kinds of violations.

Since § 16 of the Clayton Act is an Act of Congress which expressly authorizes an injunction against a state-court proceeding which violates the antitrust laws, the plain language of the anti-injunction statute excepts this kind of injunction from its coverage.[22]

## II

There is nothing in this Court's precedents which is even arguably inconsistent with this rather obvious reading of the statutory language.[23] On at least three occasions the Court

---

[22] The text of the statute is quoted in n. 4, *supra*.

[23] Rather surprisingly the plurality seems to regard *Clothing Workers* v. *Richman Bros. Co.*, 348 U. S. 511, as supporting its position. That case involved a construction of the portion of the Taft-Hartley Act that conferred jurisdiction on the National Labor Relations Board to obtain injunctive relief in certain situations. The Court rejected the argument that the statute implicitly authorized similar relief for private parties:

"Congress explicitly gave such jurisdiction to the district courts only on behalf of the Board on a petition by it or 'the officer or regional attorney to whom the matter may be referred.' § 10 (j), (l), 61 Stat. 149, 29 U. S. C. § 160 (j), (l). To hold that the Taft-Hartley Act also authorizes a private litigant to secure interim relief would be to ignore the closely circumscribed jurisdiction given to the District Court and to generalize where Congress has chosen to specify. To find exclusive authority for relief vested in the Board and not in private parties accords with other aspects of the Act." *Id.*, at 517.

Since the statute did not expressly authorize the requested relief, it was obviously not within the "expressly authorized" exception to § 2283. The fact that the Court simply read the relevant statutes literally in that case supports my view that we should use the same approach here.

In *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281, on which the plurality also relies, the union did not even argue that injunctive relief was expressly authorized by federal statute. It unsuccessfully contended "that the federal injunction was proper either 'to protect

has held that general grants of federal jurisdiction which make no mention of either state-court proceedings, or of the anti-injunction statute, are within the "expressly authorized" exception. *Providence & N. Y. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578, 599–601; [24] *Porter* v. *Dicken,* 328 U. S. 252; [25] *Mitchum* v. *Foster,* 407 U. S. 225.

or effectuate' the District Court's denial of an injunction in 1967, or as 'necessary in aid of' the District Court's jurisdiction." *Id.,* at 284. That case is wholly inapposite to the issue presented today.

The fact that these two cases provide the plurality with its strongest support emphasizes the dramatic character of its refusal to accept the plain meaning of the words Congress has written.

[24] "But the power of the District Courts to issue an injunction to stay proceedings in a State court is questioned, since, by the Judiciary Act of 1793, 1 Stat. 335, it was declared that no writ of injunction shall be granted [by the United States courts] 'to stay proceedings in any court of a State.' But the act of 1851 was a subsequent statute, and by the 4th section of this act—after providing for proceedings to be had under it for the benefit of ship owners, and after declaring that it shall be deemed a sufficient compliance with its requirements on their part if they shall transfer their interest in ship and freight for the benefit of the claimants to a trustee to be appointed by the court—it is expressly declared, that 'from and after [such] transfer all claims and proceedings against the owners shall cease.' Surely this injunction applies as well to 'claims and proceedings' in State courts as to those in the federal courts . . . ." 109 U. S., at 599–600.

[25] The relevant portions of §§ 205 (a) and (c) of the Emergency Price Control Act of 1942, 56 Stat. 33, simply provided:

"SEC. 205. (a) Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond.

"(c) The district courts shall have jurisdiction of criminal proceedings

In *Mitchum* the Court made it clear that a statute may come within the "expressly authorized" exception to § 2283 even though it does not mention the anti-injunction statute or contain any reference to state-court proceedings, provided that it creates a uniquely federal right or remedy that could be frustrated if the federal court were not empowered to enjoin the state proceeding.[26] The Court then formulated and applied this test: "The test . . . is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." 407 U. S., at 238.

Section 16 of the Clayton Act created a federal remedy which can only be given its intended scope if it includes the power to stay state-court proceedings in appropriate

---

for violations of section 4 of this Act, and, concurrently with State and Territorial courts, of all other proceedings under section 205 of this Act."

[26] "In the first place, it is evident that, in order to qualify under the 'expressly authorized' exception of the anti-injunction statute, a federal law need not contain an express reference to that statute. As the Court has said, 'no prescribed formula is required; an authorization need not expressly refer to § 2283.' *Amalgamated Clothing Workers* v. *Richman Bros. Co.,* 348 U. S. 511, 516. Indeed, none of the previously recognized statutory exceptions contains any such reference. Secondly, a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception. Three of the six previously recognized statutory exceptions contain no such authorization. Thirdly, it is clear that, in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding. This is not to say that in order to come within the exception an Act of Congress must, on its face and in every one of its provisions, be totally incompatible with the prohibition of the anti-injunction statute. The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." 407 U. S., at 237–238 (footnotes omitted).

cases. As one of the sponsors of the statute explained, under "this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy." [27] But if the plurality's interpretation of the legislation were correct, a private litigant might indeed be "ruined in his business before he has his remedy" against state-court litigation seeking enforcement of an invalid patent, a covenant not to compete, or an executory merger agreement, to take only a few obvious examples of antitrust violations that might be consummated by state-court litigation.

The plurality assumes that Congress intended to distinguish between illegal state proceedings which are already pending and those which have not yet been filed at the time of a federal court's determination that a violation of the antitrust laws has been consummated; the federal court may enjoin the latter, but is powerless to restrain the former. See *ante*, at 635–636, n. 6. Nothing in the history of the anti-injunction statute suggests any such logic-chopping distinction.[28] Indeed, it is squarely at odds with Senator Sherman's own explanation of the intended scope of the statutory power "to issue all remedial process or writs proper and necessary to enforce its provisions . . . ." [29] It would demean the legislative

---

[27] See n. 11, *supra*.

[28] Thus, the 1851 Act to limit the liability of shipowners, 9 Stat. 635, applied equally to "preventing or arresting the prosecution of separate suits," see *Providence & N. Y. S. S. Co.* v. *Hill Mfg. Co.*, 109 U. S. 578, 596. The Interpleader Act, 28 U. S. C. § 2361, in terms, applies equally to the "instituting or prosecuting" of other litigation. In terms of the interest in federalism, since the injunction against litigation typically runs against the parties rather than the court, there is little difference between denying a citizen access to the state forum and denying him the right to prosecute an existing case to its conclusion. In either situation, a federal injunction must rest on a determination that an important federal policy outweighs the interest in allowing a state court to resolve a particular controversy. But when the federal policy does justify that conclusion, the timing of the state-court action should rarely be controlling.

[29] See n. 7, *supra*.

process to construe the eloquent rhetoric which accompanied the enactment of the antitrust laws as implicitly denying federal courts the power to restrain illegal state-court litigation simply because it was filed before the federal case was concluded.[30] A faithful application of the rationale of *Mitchum* v. *Foster* requires a like result in this case.

## III

The plurality expresses the fear that if the Clayton Act is given its intended scope, the anti-injunction statute "would be completely eviscerated" since there are 26 other federal statutes which may also be within the "expressly authorized" exception. *Ante,* at 636–637, n. 7. That fear, stated in its strongest terms, is that in the 184 years since the anti-injunction statute was originally enacted, there are 26 occasions on which Congress has qualified its prohibition to some extent. There are at least three reasons why this argument should not cause panic.

First, the early history of the anti-injunction statute indicates that it was primarily intended to prevent the federal courts from exercising a sort of appellate review function in litigation in which the state and federal courts had equal competence. The statute imposed a limitation on the general equity powers of the federal courts which existed in 1793, and which have been exercised subsequently in diversity

---

[30] It is true that when the Sherman Act was passed, Congress did not expressly address "the possibility that state-court proceedings would be used to violate the Sherman or Clayton Acts." *Ante,* at 634. As the statute has been construed, however, it is now well settled that state courts can be used as the very instruments by which litigants, and the public, may be deprived of rights protected by the antitrust laws. When the state courts are so used and the antitrust laws thereby violated, the state litigation is as plainly a matter of federal legislative concern as if it had been expressly identified in the debates preceding the enactment of the 1890 statute.

and other private litigation. But the anti-injunction statute has seldom, if ever, been construed to interfere with a federal court's power to implement federal policy pursuant to an express statutory grant of federal jurisdiction.[31] Although there is no need to resolve the question in this case, I must confess that I am not now persuaded that the concept of federalism is necessarily inconsistent with the view that the 1793 Act should be considered wholly inapplicable to later enacted federal statutes that are enforceable exclusively in federal litigation.[32] If a fair reading of the jurisdictional grant in any such statute does authorize an injunction against state-court litigation frustrating the federal policy, nothing in our prior cases would foreclose the conclusion that it is within the "expressly authorized" exception to § 2283.

Second, in any event, the question whether the Packers and Stockyards Act of 1921, for example, gives the federal court the power to enjoin state litigation has little, if any, relevance to the issues presented by this case. Whatever the answer to that question may be,[33] that 56-year-old statute will not exacerbate federal-state relations and jeopardize the vitality of "our federalism." Indeed, even if all the statutes identified by the plurality are within the "expressly authorized" exception to § 2283, it is extremely doubtful that they would generate as much, or as significant, litigation as either

---

[31] As already noted, *supra*, at 654–655, n. 23, there was no such express grant of jurisdiction to private litigants in either *Clothing Workers* v. *Richman Bros. Co.*, 348 U. S. 511, or *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281.

[32] Indeed, Mr. Justice Black's opinion for the Court in *Porter* v. *Dicken*, 328 U. S. 252, seems to proceed on the assumption that the anti-injunction statute is inapplicable when the federal statute may be enforced in either a state or a federal court.

[33] Cases in which § 2283 has been held to bar injunctive relief against state proceedings have seldom involved attempts to enforce federal statutes. Indeed, some courts have held that any federal statute expressly authorizing equitable relief is within the exception from § 2283.

660

the Civil Rights Act of 1871 or the antitrust laws.[34] The answer to the important question presented by this case should not depend on speculation about potential consequences for other statutes of relatively less importance to the economy and the Nation.

Third, concern about the Court's ability either to enlarge or to contain the exceptions to the anti-injunction statute, *ante,* at 635–639, is disingenuous at best. As originally enacted in 1793, the statute contained no express exception at all. Those few that were recognized in the ensuing century and a half were the product of judicial interpretation of the statute's prohibition in concrete situations. The codification of the Judicial Code in 1948 restated the exceptions in statutory language, but was not intended to modify the Court's power to accommodate the terms of the statute to overriding expressions of national policy embodied in statutes like the Ku Klux Klan Act of 1871 or the Sherman Act of 1890.[35]

## IV

Since the votes of THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN are decisive, a separate comment on MR. JUSTICE BLACKMUN's opinion concurring in the result is required.

His agreement with the proposition that an injunction properly entered pursuant to § 16 of the Clayton Act is within the "expressly authorized" exception to the anti-injunction statute establishes that proposition as the law for the future.

---

[34] It is worthy of note that only 5 of the cited statutes predate the addition of the words "except as expressly authorized by Act of Congress" to the anti-injunction statute in 1948 (fully 16 were enacted in the last 10 years).

[35] The Reviser's Note to § 2283, which is taken from the House Report, H. R. Rep. No. 308, 80th Cong., 1st Sess., A181–A182 (1947), states that, with the exception of the addition of the words "to protect or effectuate its judgments," which were intended to overrule *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, "the revised section restores the basic law as generally understood and interpreted prior to the Toucey decision."

His view that § 16 did not authorize the preliminary injunction entered by Judge McLaren is dispositive of this litigation but, for reasons which may be briefly summarized, is not a view that finds any support in the law.

Unlike the plurality, which would draw a distinction between ongoing litigation and future litigation, *ante,* at 635–636, n. 6, MR. JUSTICE BLACKMUN differentiates between a violation committed by a multiplicity of lawsuits and a violation involving only one lawsuit. The very case on which he relies rejects that distinction. In *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 512–513, the Court stated:

> "Yet unethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in *Walker Process Equipment* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172, 175–177. Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U. S. 690, 707; *Harman* v. *Valley National Bank,* 339 F. 2d 564 (CA9 1964). Similarly, bribery of a public purchasing agent may constitute a violation of § 2 (c) of the Clayton Act, as amended by the Robinson-Patman Act. *Rangen, Inc.* v. *Sterling Nelson & Sons,* 351 F. 2d 851 (CA9 1965).
>
> "There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations."

Each of the examples given in this excerpt from the *California Motor Transport* opinion involves a single use of the adjudicatory process to violate the antitrust laws.

Manifestly, when Mr. Justice Douglas wrote for the Court in that case and described "a pattern of baseless, repetitive claims," *id.*, at 513, as an illustration of an antitrust violation, he did not thereby circumscribe the category to that one example. Nothing in his opinion even remotely implies that there would be any less reason to enjoin the "[u]se of a patent obtained by fraud to exclude a competitor from the market," *id.*, at 512, for example, than to enjoin the particular violation before the Court in that case.

In this case we are reviewing the affirmance by the Court of Appeals of an order granting a preliminary injunction. Affirmance was required unless the exercise of the District Court's discretion was clearly erroneous. And when both the District Court and the Court of Appeals are in agreement, the scope of review in this Court is even more narrow, *Faulkner* v. *Gibbs*, 338 U. S. 267, 268; *United States* v. *Dickinson*, 331 U. S. 745, 751; *Allen* v. *Trust Co.*, 326 U. S. 630, 636. Without the most careful review of the record, and the findings and conclusions of the District Court, it is most inappropriate for this Court to reverse on the basis of a contrary view of the facts of the particular case.

The mere fact that the Illinois courts concluded that petitioner's state-law claim was meritorious does not disprove the existence of a serious federal antitrust violation. For if it did, invalid patents, price-fixing agreements, and other illegal covenants in restraint of trade would be enforceable in state courts no matter how blatant the violation of federal law.

## V

Apart from the anti-injunction statute, petitioner has argued that principles of equity, comity, and federalism create a bar to injunctive relief in this case. Brief for Petitioner 36–39. This argument is supported by three facts: The Illinois litigation was pending for a period of nine years; the Illinois Supreme Court concluded that respondents were guilty of

a breach of fiduciary duty; and respondents withdrew their antitrust defense from the state action.

Unfortunately, in recent years long periods of delay have been a characteristic of litigation in the Illinois courts. That is not a reason for a federal court to show any special deference to state courts; quite the contrary, it merely emphasizes the seriousness of any decision by a federal court to abstain, on grounds of federalism, from the prompt decision of a federal question.

The Illinois Supreme Court's conclusion that respondents had violated a fiduciary obligation and that petitioner was entitled to a large damages recovery rested on that court's appraisal of the legality of a covenant in restraint of trade.[36] The fact that the covenant not to compete is valid as a matter of state law is irrelevant to the federal antitrust issue. If, for example, instead of a contract totally excluding respondents from the relevant market, the parties had agreed on a lesser restraint which merely required respondents to sell at prices fixed by petitioner, the Illinois court might also have concluded that respondents were bound by the contract even though the federal courts would have found it plainly violative of the Sherman Act. The Illinois decision on the merits merely highlights the fact that state and federal courts apply significantly different standards in evaluating contracts in restraint of trade.[37]

---

[36] "In some situations there could be, of course, a violation of a covenant not to compete without the breach of a fiduciary duty, as would be the case if Stoner had not been an officer and director of plaintiff. In the present case, however, the acts of defendants in misappropriating the Lektro-Vend [machine] and their use of it to compete against plaintiff are intertwined, the latter being, so to speak, the means by which the former was brought to bear against plaintiff." *Vendo Co.* v. *Stoner*, 58 Ill. 2d 289, 306–307, 321 N. E. 2d 1, 11 (1974).

[37] Indeed, a state court's conclusion that the breach of a covenant not to compete constitutes the violation of a fiduciary obligation as a matter of state law is not inconsistent with a federal-court determination that the litigation enforcing that covenant was "conducted in bad faith" as that

That fact provides the explanation for respondents' decision to withdraw their federal antitrust defense from the. Illinois litigation and to present it to the federal courts. Congress has granted the federal courts exclusive jurisdiction over the prosecution of private antitrust litigation.[38] Since the state courts do not have the power to award complete relief for an antitrust violation, since state judges are unfamiliar with the complexities of this area of the law, and since state procedures are sometimes unsatisfactory for cases of nationwide scope, no adverse inference should be drawn from a state-court defendant's election to reserve his federal antitrust claim for decision by a federal court.

Indeed, since these respondents made that election, and since Congress has withheld jurisdiction of antitrust claims from the state courts, the plurality properly ignores the argument that principles of federalism require abstention in this case. For a ruling requiring the federal court to abstain from

---

concept is used in cases like *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 611. While the District Court did not specifically address the question involved in *Huffman* and *Younger* v. *Harris*, 401 U. S. 37, it had the following to say in addressing the extent of the Sherman Act violation:

"There is persuasive evidence that Vendo's activities in its litigation against the Stoner interests in Illinois state court were not a genuine attempt to use the adjudicative process legitimately. Its theft of trade secret claim was clearly non-meritorious, and litigation of this claim might well be interpreted—considering the record as a whole—as an attempt to further harass the Stoner interests and limit the amount of aid Stoner could lend Lektro-Vend. The attempt to enforce the covenants not to compete . . . appears to have been to lengthen the period for which the noncompetition covenants would run. The purpose of this portion of the state litigation seems purely anticompetitive." 403 F. Supp., at 534–535.

The Court of Appeals implicitly affirmed, *supra,* at 646. Thus while every state proceeding which clashes with the antitrust laws would not necessarily be motivated by a desire to harass or be conducted in bad faith, the findings indicate that such was the case here.

[38] See *Freeman* v. *Bee Machine Co.*, 319 U. S. 448; *General Investment Co.* v. *Lake Shore & Mich. So. R. Co.*, 260 U. S. 261.

the decision of an antitrust issue that might have been raised in a state-court proceeding would be tantamount to holding that the federal defense *must* be asserted in the state action. Such a holding could not be reconciled with the congressional decision to confer exclusive jurisdiction of the private enforcement of the antitrust laws on the federal courts. Quite plainly, therefore, this is not the kind of case in which abstention is even arguably proper.

When principles of federalism are invoked to defend a violation of the Sherman Act, one is inevitably reminded of the fundamental issue that was resolved only a few years before the anti-injunction statute was passed. Perhaps more than any other provision in the Constitution, it was the Commerce Clause that transformed the ineffective coalition created by the Articles of Confederation into a great Nation.

> "It was . . . to secure freedom of trade, to break down the barriers to its free flow, that the Annapolis Convention was called, only to adjourn with a view to Philadelphia. Thus the generating source of the Constitution lay in the rising volume of restraints upon commerce which the Confederation could not check. These were the proximate cause of our national existence down to today.
>
> .       .       .       .       .
>
> "So by a stroke as bold as it proved successful, they founded a nation, although they had set out only to find a way to reduce trade restrictions. So also they solved the particular problem causative of their historic action, by introducing the commerce clause in the new structure of power.
>
> ". . . On this fact as much as any other we may safely say rests the vast economic development and present industrial power of the nation. To it may be credited largely the fact we are an independent and democratic country today." W. Rutledge, A Declaration of Legal Faith 25–27 (1947).

Only by ignoring this chapter in our history could we invoke principles of federalism to defeat enforcement of the "Magna Carta of free enterprise" [39] enacted pursuant to Congress' plenary power to regulate commerce among the States.

I respectfully dissent.

---

[39] "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster." *United States* v. *Topco Associates,* 405 U. S. 596, 610. See also *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219, 235–236.