**FARBENFABRIKEN BAYER A.G.,**
Appellant,

v.

**STERLING DRUG, INC.**

No. 13806.

United States Court of Appeals
Third Circuit.

Argued May 7, 1962.

Decided Aug. 9, 1962.

See also, 307 F.2d 210.

Milton V. Freeman, Washington, D. C. (Thurman Arnold, Edgar H. Brenner, Werner J. Kronstein, Arnold, Fortas & Porter, Washington, D. C., Jay E. Bailey, Bailey & Schenck, Newark, N. J., on the brief), for appellant.

Robert G. Zeller, New York City (John T. Cahill, New York City, Cahill, Gordon, Reindel & Ohl, New York City, Rogers, Hoge & Hills, New York City, O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., on the brief), for appellee.

Before McLAUGHLIN, STALEY and GANEY, Circuit Judges.

STALEY, Circuit Judge.

Plaintiff, Farbenfabriken Bayer A.G., like defendant, Sterling Drug, Inc., is engaged in the manufacture and distribution of drugs and pharmaceutical products. In 1918, after the United States entered the war against Germany, the capital stock of The Bayer Company, Inc. ("Bayer") a wholly owned subsidiary of plaintiff's predecessor, Farbenfabriken vorm. Freidrich Bayer and Company ("Farbenfabriken"), was sold to defendant by the Alien Property Custodian, whereupon Bayer became a wholly owned subsidiary of defendant.

In 1920, after the war, Farbenfabriken and Bayer executed a contract which granted Bayer the exclusive license to use certain trademarks in selling aspirin in various Latin American countries; Farbenfabriken promised to ship and deliver aspirin and aspirin products to Bayer only, and the parties agreed to endeavor to prevent the importation into Latin America of all aspirin and aspirin products bearing the trademarks covered by the agreement. In 1923, Bayer and Farbenfabriken entered into another agreement effecting a world-wide division of the

drug and pharmaceutical market between them. Until 1939, Bayer acted as the Latin American distributor for aspirin manufactured by Farbenfabriken. Thereafter, defendant acted as both the manufacturer and distributor. Continuously until the summer of 1941, Farbenfabriken received 75 per cent of the profits arising from Latin American sales, while Bayer retained 25 per cent. In 1937, defendant purchased the "Aliviol" business of Laboratorios Recalcine, a Chilean company, and a majority of the stock of Laboratorios Suarry, S. A., an Argentinian company.

In 1941, the United States District Court for the Southern District of New York declared the 1920 and 1923 agreements illegal under the antitrust laws of the United States and enjoined Bayer from further performance of any of their provisions. Thereafter, Bayer discontinued the sale of aspirin in Latin American countries. The "Aliviol" business, which in the meantime had been transferred to Laboratorios Hegemann y Cia, Ltda., and Laboratorios Suarry, S. A., were conveyed in 1941 to new companies wholly owned or controlled by defendant, and in January of 1942 aspirin products were made available in Latin America under new trademarks registered by defendant.

Plaintiff commenced this action for an accounting of profits, its rights in the aspirin business that defendant had been conducting in Latin America after the agreements were declared illegal, as well as its interests in the Hegemann and Suarry companies. The defendant contends that all of plaintiff's claims arise out of contracts violative of the antitrust laws. It urges that to grant such relief would be against public policy. The district court agreed with defendant and entered summary judgment in its favor.[1]

The controlling rule of law was clearly spelled out by the Supreme Court in Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909). There, plaintiff brought an action to recover the unpaid purchase price of merchandise sold and delivered to defendant under an agreement that violated the antitrust laws. In affirming judgment for defendant, the Court said:

"The present suit is not based upon an implied contract of the defendant company to pay a reasonable price for goods that it purchased, but upon agreements, to which both the plaintiff and the defendant were parties, and *pursuant to which* the accounts sued on were made out, and which had for their object, and which it is admitted had directly the effect, to accomplish the illegal ends for which the Continental Wall Paper Company was organized. If judgment be given for the plaintiff the result, beyond all question, will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination." 212 U.S. at 261, 29 S.Ct. at 292 (Emphasis in original.)

In accord with that proposition is Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55 (1891), and its application to varying fact situations can be found in Tampa Electric Co. v. Nashville Coal Co., 276 F.2d 766 (C.A.6, 1960), reversed on other grounds, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29 (C.A.7, 1959); United States v. Bayer Co., 135 F.Supp. 65 (S.D.N.Y., 1955); Fui-Vue Sales Co. v. American Optical Co., 118 F.Supp. 517 (S.D.N.Y., 1953). And the same rule has been applied to contracts not involving a violation of the antitrust laws. E. g., Bromberg v. Moul, 275 F.2d 574 (C.

---

1. Any claim by plaintiff that it was unaware that the covenant not to compete, which permeated and tainted the agreements, violated the antitrust laws, and that it should, therefore, be allowed to recover, fails in light of Reynolds Metals Co. v. Metals Disintegrating Co., 8 F.R.D. 349 (D.N.J.1948), aff'd, 176 F.2d 90 (C.A. 3, 1949).

A.2, 1960) (OPS regulation); Pittsburgh Dredging & Construction Co. v. Monongahela & Western Dredging Co., 139 F. 780 (W.D.Pa.1905) (contract for collusive bidding). However, where recovery is sought based on an obligation collateral to but independent of the illegal agreement, and the court, in allowing recovery, need not look to and enforce the terms of the illegal agreement, illegality is no bar. Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915); Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902); Pullman's Palace Car Co. v. Central Transportation Co., 171 U.S. 138, 18 S. Ct. 808, 43 L.Ed. 108 (1898); Morand Bros. Beverage Co. v. National Distillers & Chemical Corp., 25 F.R.D. 27 (N.D. Ill., 1959). A review of the facts in the most recent of these decisions, Kelly, brings the rule sharply home. Plaintiff there commenced an action to recover the purchase price of fifty cars of onions. Defendant interposed the defense that the sale was made pursuant to an indivisible agreement violative of the antitrust laws. The Supreme Court, in affirming the action of the district court that struck the defense, indicated that the sale itself was a lawful one, for fair consideration, and it was not necessary to look to or enforce the terms of the illegal agreement.

Plaintiff here argues that granting the relief it seeks would not violate the principle of Continental, for in awarding it the lump sum payment it seeks, the court would not be enforcing the provisions of the illegal agreement, nor does it seek to have the defendant continue to perform that agreement in the future.

The 1920 agreement provided that plaintiff was to receive 75 per cent of the profits arising out of the sale of aspirin in Latin America. Bayer was to retain the remaining 25 per cent, and the agreement was to last for fifty years. Bayer and Farbenfabriken further agreed not to offer or market independently aspirin or its compounds under any trademark or trade name in any of the Latin American countries. Under the agreement, the books of Farbenfabriken and Bayer were to be made up at the end of the calendar year, and any profits due were to be paid within ninety days after the amount had been certified and approved by the parties. It further provided that products delivered by Farbenfabriken for sale in the Latin American market were to be paid for by Bayer at the pro forma cost price of such products ninety days after delivery. The agreement also covered other products sold by Bayer under the Bayer or any other registered trademark owned by Farbenfabriken.[2]

In 1937, Farbenfabriken and defendant agreed that the latter would purchase and pay for the "Aliviol" business of Laboratorios Recalcine and a majority of the stock of Laboratorios Suarry. It was agreed that Farbenfabriken would purchase seventy-five per cent of the interest of defendant in the two companies after they were acquired by defendant.

Plaintiff's complaint makes it perfectly clear that what it seeks are the profits derived from the business conducted under the illegal agreements. It sets out four causes of action. The first one refers to the 1920 agreement as the basis for the claim, and prays:

"Wherefore, plaintiff prays for an accounting of the profits of the joint Latin American business under the 1920 contract for the years 1940 and 1941 and payment to it of the amounts so allowed, and for such other and further relief as to the Court seems just."

In its second cause of action, plaintiff seeks an accounting of its interest in the aspirin business conducted in Latin

2. Farbenfabriken has not alleged that it was not paid for goods and services delivered or performed by it under the agreements.

**210**

America by defendant after the agreements were declared illegal. It contends that the agreements resulted in a joint venture in which it had a proprietary interest. From this it argues that by granting an accounting the court need not enforce any of the provisions of the agreements, but merely enforce its rights as a party to a joint venture. The district court, however, correctly found that the 1920 agreement did not give rise to a joint venture. It fails to provide for joint control in or a continuing right to management of the Latin American business, an indispensable element of a joint venture. Assuming arguendo that a joint venture was created, we think it immaterial, for what plaintiff actually is seeking is an accounting of the profits arising out of the 1920 agreement.

Plaintiff's third cause of action was an alternative claim for damages for a breach of the 1920 agreement. It did not press that cause of action in the district court, nor does it do so here.

In the fourth cause of action, plaintiff again invoked the provisions of the 1920 agreement and sought an accounting from defendant with respect to Hegemann and Suarry. Plaintiff stipulated in the district court, however, that its interest in the two was to be paid for *solely out of profits* resulting from the sale of aspirin under the 1920 agreement in certain enumerated Latin American countries.

Thus it is abundantly clear that what plaintiff is attempting to recover are profits arising directly from operations conducted by defendant and itself under the illegal agreements; one wrongdoer seeking the aid of the court to compel the other wrongdoer to disgorge its share of the spoils. Under the circumstances, to grant that relief the court not only would be required to look to but to enforce the illegal agreements, for here recovery does not depend on a collateral obligation or on one that arises independently as was true in Kelly, Bruce's Juices, Wilder, and Connolly, supra. In this situation, what the Supreme Court said in Continental Wall Paper Co. v. Louis Voight &

Sons Co., 212 U.S. at 262, 29 S.Ct. at 292, is apposite:

"\* \* \* We hold that such a judgment cannot be granted without departing from the statutory rule, long established in the jurisprudence of both this country and England, that a court will not lend its aid, in any way, *to a party seeking to realize the fruits of an agreement* that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which as between man and man he ought, perhaps, to pay, but for which he is unwilling to pay.

"In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties." (Emphasis supplied.)

The judgment of the district court will be affirmed.