590 F.2d 457
 101 L.R.R.M. (BNA) 2396, 85 Lab.Cas. P 10,995,
1978-2 Trade Cases 62,398,
1 Employee Benefits Ca 1667
 Harry HUGE, C. W. Davis, and Paul R. Dean, as Trustees of
the United Mine Workers of America Health and
Retirement Funds, Appellees,
v.
LONG'S HAULING COMPANY, INC., Appellant.
 No. 78-1060.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 5, 1978.
Decided Dec. 14, 1978.
 
 Jack W. Plowman, Plowman & Spiegel, Pittsburgh, Pa., for appellees.
 John J. McLean, Jr., R. A. King, Melvin L. Moser, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellant.
 Before SEITZ, Chief Judge, and ADAMS and ROSENN, Circuit Judges.
 
 OPINION
 
 1
 SEITZ, Chief Judge, announcing the judgment of the court.
 
 
 2
 Defendant Long's Hauling Company (Long) appeals from a preliminary injunction granted to the trustees of the United Mine Workers of America Health and Retirement Funds. See Huge v. Long's Hauling Co., 442 F.Supp. 1041 (W.D.Pa.1977). The trustees brought this suit under section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185, to enforce an alleged contractual obligation to make payments to the Health and Retirement Funds. Counterclaims filed by Long remain pending in the district court.
 
 
 3
 * For several years prior to 1975, Long, an independent hauler of coal, had collective bargaining agreements with the United Mine Workers of America (UMW). The parties usually patterned their agreements on the national contracts between the UMW and the Bituminous Coal Operators Association (BCOA). Traditionally, however, the UMW's agreement with Long allowed Long to make payments to private health and pension funds rather than the national funds maintained by the UMW.
 
 
 4
 In 1974, Long and the UMW entered into a contract that was to extend into 1976. As under prior agreements, Long was to pay into its private funds. The contract also called for 60-days notice prior to cancellation by either party. In the same year that Long signed this agreement, the UMW and the BCOA consummated the National Bituminous Coal Wage Agreement of 1974. Article II of the national agreement dealt with contracts for transportation:
 
 
 5
 The transportation of coal as defined in paragraph (a) may be contracted out only to a contractor employing members of the UMWA under this Agreement . . . .
 
 
 6
 In early 1975 UMW organizers began to stop Long's trucks as they attempted to enter mines operating under the national agreement. The drivers were told that Long had no agreement with the UMW. Upon contacting union officials, Long learned that the UMW would continue to stop Long's trucks until Long signed an agreement identical in all respects to the national contract. Succumbing to this pressure, Long signed such an agreement on February 4, 1975.
 
 
 7
 The new contract did not exempt Long from making payments to the national funds. Nevertheless, Long continued to pay into its private funds, and made no payments into the UMW's funds. On March 14, 1977, the trustees of the UMW funds filed this suit to collect back payments and to compel future payments. Long filed counterclaims for damages against the trustees for alleged violations of the labor and antitrust laws. These counterclaims remain pending in the district court.
 
 II
 
 8
 On appeal Long argues that the district court erred in entering a preliminary injunction in favor of the trustees. Long first asserts that Article II of the national agreement violates the Sherman Act and renders the entire contract unenforceable. Second, Long disclaims liability to the trustees because the UMW's tactics and Article II itself allegedly violate section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 158.
 
 A.
 
 9
 Long would interpose the UMW's alleged violation of the Sherman Act as a defense against its promise to pay into the UMW funds. At common law a promisor could assert against a third-party beneficiary any defense he could assert against the original promisee. See Restatement of the Law of Contracts § 140 (1932). Nevertheless, courts have been extremely reluctant to recognize any defense to an employer's promise to pay into a pension fund. The trustees of the fund, although technically third-party beneficiaries, often can avoid contractual defenses that could be asserted against the union itself. See Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960).
 
 
 10
 Drawing on Benedict Coal, courts have denied employers a variety of defenses whenever the royalties sought by the trustees were payable for coal already mined. See, e. g., Pennington v. United Mine Workers of America, 325 F.2d 804 (6th Cir. 1963), Rev'd as to other portions, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Boyle v. North Atlantic Coal Corp., 331 F.Supp. 1107 (W.D.Pa.1971). As this court has noted, such payments "have the characteristics of compensation to the employees for services they have already rendered." Lewis v. Seanor Coal Co., 382 F.2d 437, 441 (3d Cir. 1967), Cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968). In this case, however, the trustees seek to enforce Long's promise prospectively as well as retrospectively. Courts have not explored the boundaries of Benedict Coal Where the trustees wish to compel future payment of royalties as yet unearned. Nor do the facts before us raise this issue, since Long's antitrust defense is insufficient under established precedent.
 
 
 11
 In declining to consider Long's antitrust defense to the trustees' request for a preliminary injunction the district court relied exclusively on this court's opinion in Lewis v. Seanor Coal Co., supra. Seanor 's facts are strikingly similar to those presented by the instant case. Additionally, its analysis of the antitrust issue would seem to dispose of Long's appeal. Nevertheless, because some of Seanor 's broad statements may be dicta, Long's arguments merit a fresh analysis of the rules and policies at stake.
 
 
 12
 The Supreme Court has not favored antitrust-based defenses to otherwise valid contracts. In Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), the Court laid out the policies underlying close circumscription of such defenses. Most importantly, the Sherman Act already provides for a powerful private remedy: an action for three times the damages caused by a violation. Because of this express remedy, "the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act." Id. at 519, 79 S.Ct. at 431.
 
 
 13
 Furthermore, by allowing one party to avoid its obligations under a contract, the courts may create more inequities than they remedy. In the words of Mr. Justice Holmes, courts must be wary to prevent people "from getting other people's property for nothing when they purport to be buying it." Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 271, 29 S.Ct. 280, 53 L.Ed. 486 (1909) (dissenting opinion), Quoted in Kelly v. Kosuga, supra, at 520-21, 79 S.Ct. at 432.
 
 
 14
 Here, these two policies militate against allowing Long an antitrust defense at this point. Most significantly, the district court expressly preserved Long's right to press its counterclaim and to seek treble damages against the offending parties, including the UMW. See 442 F.Supp. at 1044. Given the posture of this action, an antitrust defense would be both misdirected and statutorily unjustifiable in light of Kosuga 's first admonition. Additionally, allowing such a defense against the trustees may create unforeseeable inequities. Although Long has paid into private funds, health and pension plans are not fungible. It is impossible to gauge the effect of substituting one plan for another. Were such a defense granted here, this court would be hard-pressed to deny it to any employer who had signed an agreement containing Article II, especially if that employer offered some semblance of an alternative plan. Such a result would be totally inconsistent with Kosuga.
 
 
 15
 Long asserts that Kosuga, while refusing to grant an antitrust defense on its facts, approved such a defense whenever a judgment in favor of liability would enforce "the precise conduct made unlawful by the (Sherman) Act . . . ." Kelly v. Kosuga, supra, at 520, 79 S.Ct. at 432. But by removing this statement from its context Long disserves the need for restraint stressed by the Supreme Court throughout the opinion. Were a court to recognize an antitrust defense whenever failure to grant such a defense would ratify the contract, the exception would swallow Kosuga 's rule. Seanor rejected such an interpretation of Kosuga ; it should be rejected again in this case.
 
 
 16
 Kelly v. Kosuga will not support an antitrust defense where trustees seek a preliminary injunction enforcing a contractual obligation to make payments into welfare and pension funds. As already noted, Long's counterclaim challenging the legality of Article II is still pending against the trustees. Should this claim succeed, the trustees' right to prospective payments under the contract could depend upon a number of factors, including the severability of Article II from the rest of the contract. This appeal, of course, does not present those issues. The district court did not err in denying Long an antitrust defense against the trustees' request for a preliminary injunction.
 
 B.
 
 17
 Long claims that the UMW engaged in unfair labor practices by ignoring the extant contract between Long and its employees and by pressuring Long to sign a new agreement. In addition, Long asserts that Article II is a "hot cargo" clause proscribed by section 8(e) of the NLRA. The district court refused to allow Long to interpose these allegations as a defense to the trustees' suit.
 
 
 18
 In San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court held that courts must defer to the National Labor Relations Board whenever an activity is even "arguably subject" to section 8 of the NLRA. Long admits that its allegations are within the ambit of section 8. Nevertheless, Long asserts, the Supreme Court has recognized two exceptions to Garmon, either of which would allow the district court to consider its defenses.
 
 
 19
 First, Long argues that Connell Construction Co. v. Plumbers & Steamfitters Local No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), established the authority of the courts to hear "labor law questions that emerge as collateral issues" in antitrust suits. Id. at 626, 95 S.Ct. at 1837. Long again reads the Supreme Court's precedents too loosely. In Connell plaintiff claimed that certain picketing violated the Sherman Act. In defense, the union initially contended that section 8(e) of the NLRA authorized such conduct and overrode the earlier-enacted Sherman Act. Even if section 8(e) did not endorse such activity, the union argued, the NLRB had exclusive remedial jurisdiction over all actions arguably governed by section 8.
 
 
 20
 In reaching the merits of Connell's antitrust claim, the Supreme Court rejected both of these threshold arguments. The NLRB's jurisdiction over violations of section 8 did not displace the federal courts' jurisdiction over antitrust violations, even though the same conduct could be both an illegal restraint of trade and an unfair labor practice. Furthermore, the courts can resolve "collateral" issues of labor law when such resolution is necessary to grant relief under an independent federal remedy like the Sherman Act.
 
 
 21
 Connell clearly allows Long to prosecute its antitrust claim even though Article II may also violate section 8(e). Connell does not, however, grant the federal courts jurisdiction concurrent with that of the NLRB to remedy violations of section 8. Long's antitrust allegations, discussed above, are completely severable from its labor allegations. Resolution of the former does not require determination of the latter. The rule that Long seeks would allow any plaintiff to bootstrap itself into a position to litigate in district court claims within the NLRB's primary jurisdiction simply by adding unrelated antitrust allegations. This would go far beyond the holding in Connell.
 
 
 22
 Alternatively, Long suggests that William E. Arnold Co. v. Carpenters District Council, 417 U.S. 12, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974), creates a special exception to Garmon for contractual actions brought under section 301 of the LMRA. In Arnold An employer brought an action under section 301, alleging breach of a no-strike clause. The union sought to deprive the district court of jurisdiction by arguing that its alleged breach also would constitute an unfair labor practice. The Court held that, in a section 301 action, where the offending activity constitutes both a breach of contract and an unfair labor practice, the courts may determine the contractual claim.
 
 
 23
 Like Connell, Arnold is properly distinguishable from the present case. Although Long alleges that the UMW's conduct both breached the contract and constituted unfair labor practices, Lewis v. Benedict Coal Corp., supra, clearly indicates that the trustees are entitled to Long's payment despite contractual breaches by the UMW. Long's only cause of action for breach of contract lies against the UMW, not the trustees. One lower court seems to have allowed a case like this to proceed, but that court did not expressly consider the jurisdictional issue. See Waggoner v. R. McGray, Inc., 432 F.Supp. 580 (C.D.Cal.1977).
 
 
 24
 Under Garmon, Long's allegations of unfair labor practices and violations of section 8(e) were not proper defenses before the district court.
 
 III
 
 25
 The district court did not err in declining to consider either the antitrust counterclaim or the labor counterclaim in defense to the trustees' request for a preliminary injunction. The counterclaims presumably will be resolved at some later date, at which time the district court can consider whether the UMW itself is an indispensable party to such claims. The order of the district court will be affirmed.
 
 
 26
 ADAMS, Circuit Judge, concurring.
 
 
 27
 As I see it, this appeal primarily presents the issue whether, when the trustees of union welfare and pension funds sue to compel an employer to make payments to the funds pursuant to the terms of a labor agreement between the employer and the union, the employer may defend on the ground that union misconduct excused its obligation to perform. Specifically, Long's Hauling Company (Long) raises the defenses of antitrust illegality and labor law violations on the part of the United Mine Workers of America in opposition to a claim by the trustees of that union's health and retirement funds that Long has undertaken to contribute to the funds by signing the 1974 National Agreement.
 
 
 28
 Long contends, first, that the Union violated the antitrust laws in coercing it to assume that obligation. It avers that United Mine Workers representatives prevented its trucks from hauling coal from a mine that was operated by a party to the 1974 National Agreement and threatened to disrupt Long's business with the mining company in the future unless Long signed the National Agreement. The UMW was capable of enforcing its threats, Long alleges, since a clause in the National Agreement prohibited signatories from contracting the handling of coal to a trucker that is not a party to the National Agreement. Long insists that the clause in question is an illegal restraint of trade under section 1 of the Sherman Act, and that as a result of such restraint, it was compelled to sign the National Agreement. Second, Long argues that the clause constituted an unfair labor practice and a "hot cargo" clause in violation of sections 8(d) and 8(e), respectively, of the National Labor Relations Act and that consequently the entire National Agreement was void, including the provisions covering employer contributions to the union's health and retirement funds.
 
 
 29
 The district court held that it could not consider the merits of Long's antitrust defense and that it did not have jurisdiction over the labor law defenses, and issued a preliminary injunction ordering Long to contribute to the funds. This Court now affirms the judgment of the trial court. I agree with Chief Judge Seitz that the federal courts do not have jurisdiction to entertain Long's unfair labor practice and "hot cargo" clause defenses; as to these matters, the National Labor Relations Board has original jurisdiction. However, because I would follow a different route from Chief Judge Seitz in disposing of Long's antitrust illegality defense, I write this separate opinion.
 
 
 30
 Evidently, Chief Judge Seitz would permit employers as a general matter to interpose defenses to suits by union pension fund trustees to compel payments to the fund. But he relies on Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), to conclude that a court may not consider an antitrust violation that was asserted as a defense to such suit. In my view, denial of Long's defense on the authority of Kosuga would invite further wasteful and fruitless litigation by employers who wish to avoid their contractual obligations to contribute to union welfare and pension funds. Inasmuch as the Supreme Court has, to this date, left open the possibility that under certain circumstances a charge of antitrust illegality may properly be entertained as a defense to a contract claim, See id. at 520, 79 S.Ct. 429, employers in the future may still attempt to bring themselves within that exception.[1] And defenses by employers on grounds other than antitrust illegality would not be precluded at all. Because I believe it desirable to have a clear rule that would foreclose such litigation altogether,[2] I prefer to rest affirmance of the district court judgment on the ground that where the trustees of a union welfare or pension fund sue to compel an employer to make contributions as stipulated in the labor contract between the employer and the union, the employer may not assert Any defenses that he may arguably have to that contract.
 
 
 31
 My analysis begins with Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). In Benedict, the trustees of a union pension fund sued a coal operator to collect royalties due the fund under the collective bargaining agreement between the union and the employer. The coal operator contended that under contract rules concerning third-party beneficiaries, it should be permitted to set off against its liability to the fund damages incurred when the union engaged in strikes and work stoppages in contravention of its contractual promises.
 
 
 32
 This argument was rejected by the Supreme Court, which refused to treat labor agreement provisions stipulating that an employer make payments to a union pension fund as a typical third-party beneficiary contract. It regarded the employer's contributions to the fund as "really another form of compensation to the employees," and deduced that, "as such, the obligation to pay royalty might be thought to be incorporated into the individual employment contracts."[3] The Supreme Court also noted that national labor policy, out of "solicitude for the union members, because they might have little opportunity to prevent the union from committing actionable wrongs," does not permit recourse against anyone but the union to recover damages for injuries inflicted by that entity. In the Court's view, this policy applies "with even greater force to protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependents . . . ."[4] These and other related considerations[5] influenced the Supreme Court to adopt a rule different from that of general contract law by exercising the federal judiciary's authority to fashion federal common law for the enforcement of collective bargaining contracts. It held that the parties to such agreements "must express their meaning in unequivocal words before they can be said to have agreed that the union's breaches of its promises should give rise to a defense against the duty assumed by an employer to contribute to a welfare fund . . . ."[6]
 
 
 33
 Lower federal courts have recognized that the Supreme Court's discussion in Benedict evinces a considered judgment that the ramifications for national labor policies must be surveyed before labor agreements pertaining to employer contributions to union welfare and pension funds are subjected to contract principles governing third-party beneficiary situations.[7] Accordingly, attention has been given to the concerns expressed in Benedict in cases raising issues other than the narrow question decided by the Supreme Court of how the intent of the parties to a labor agreement should be construed. Almost invariably, when faced with a suit to compel employer payments to union welfare or pension funds, the courts have disallowed defenses sought to be interposed by employers to enforcement of the contract based on such grounds as failure of consideration, existence of parol evidence to establish a different agreement, fraud, misrepresentation, and duress on the part of the union.[8] Indeed, circumstances similar to those presented here formed the backdrop for the Sixth Circuit's opinion in Pennington v. United Mine Workers of America, 325 F.2d 804 (6th Cir. 1963), Rev'd as to other portions, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In that case, an employer refused to make payments to the union's pension fund on the ground that it had been coerced into signing the labor agreement under threats of violence, as part of a combination among the union and several large coal companies that violated the Sherman Act. After discussing alternative grounds for affirming the district court's holding in favor of the trustees, the court of appeals relied on Benedict to conclude that, "with respect to the coal already mined and the rights accrued thereby, we are of the opinion that the Trustees' right to recover is not barred." Id. at 819. The approach taken in Benedict and the subsequent decisions appears effectively to dispose of Long's defense of antitrust illegality.
 
 
 34
 The wisdom of not permitting employers such as Long to interpose defenses to their undertaking to support union welfare and pension funds seems apparent. With both the number of Americans in retirement and the duration of those non-remunerated years of their lives increasing, and with the cost of health care soaring, it has become ever more important to provide for those situations where the cost of living will no longer be satisfied from anticipated income. Social security benefits are often insufficient by themselves to meet those needs, and must be supplemented from other sources. For millions of unionized employees, the chosen and preferred method for insuring against the privations of sickness, unemployment, and old age has been the union welfare and pension funds. Under such arrangements, the employer contributes periodically to the funds an amount negotiated by contract. Such contributions are, in reality, indirect or deferred compensation, earned by the employee with each hour or each day worked. Ensuring the viability of these funds and protecting the employees' investment from dissipation as a result of union or employer conduct or misconduct has for many years been a concern of the federal government,[9] and has recently received renewed attention.[10]
 
 
 35
 As Benedict makes clear, vital public interests are served by insulation of the employer's obligations to union welfare and pension funds form under the labor contract. It prevents penalizing employees for alleged union misdeeds over which they have little, if any, control. And it guarantees hard-working people the unemployment, health and retirement protections that they and their families expect to receive as part of the terms of their employment.[11]
 
 
 36
 Moreover, such a rule forces an employer to disclose promptly any problems that may exist in its undertaking to provide for its employees' health and retirement needs, rather than create false impressions in the minds of its employees regarding the compensation they are entitled to receive. It thus forecloses the possibility that an employer will surprise its employees by revealing at a late date that it was not legally bound to provide for contingencies that may afflict them or their families in the future. The employer may still have its claims adjudicated by bringing, in the proper forum, a timely suit against the union for rescission of the contract, antitrust damages, or a declaration that an unfair labor practice has been committed, as the case may be. It would be discouraged, however, from biding its time in such a way as to jeopardize the future security of its employees.
 
 
 37
 Finally, it appears preferable as a matter of judicial administration to require that the employer sue the union directly if it believes it has reason to be excused from performing under the labor agreement, instead of permitting it to assert its claim by way of defense against the trustees. The employer dealt with the union and bases its case on those dealings. Clearly, the enforceability of the labor agreement can better be ascertained in the context of a lawsuit to which the principal actors are parties than in one where one party, the trustees, does not have first-hand knowledge of the material facts.[12]
 
 
 38
 I recognize that Long is in a more appealing position than the typical employer seeking to avoid its contractual duty to contribute to a pension fund, because Long continues to make payments to a private fund pursuant to a separate agreement with the local union. But that would not appear to justify a departure from a clear and consistent rule barring employer defenses to suits by pension fund trustees. The risks that the important interests of the employees will be eroded by exceptions to the rule and that the rule itself might eventually be undermined outweigh the equities that favor even an employer with the most sympathetic position.[13] As against the risks that are entailed in complicating a simple, workable rule by engrafting case-by-case exceptions upon it, the employer suffers no real harm: It remains free to initiate suit against the union to excuse its performance under the labor agreement, and is forewarned by the rule's absolute application that until it prevails in such lawsuit it will be held to its undertaking to contribute to the union's welfare and pension funds.
 
 
 39
 ROSENN, Circuit Judge, dissenting.
 
 
 40
 I respectfully dissent from the opinions of the majority.
 
 
 41
 Although those opinions briefly set forth the facts of this controversy, I believe that further amplification will help to put the case in perspective. The district court found as a fact that since 1962 the employees of Long's Hauling Company, Inc., ("Long") have been represented in collective bargaining by the United Mine Workers of America ("UMW") and by District 5 of that union (sometimes jointly referred to herein as the "Union"). During this period, Long and District 5 have negotiated several collective bargaining agreements. As the district court found, "(c)onsistently, these agreements have been based on the National Agreement, but have contained a clause rendering, Inter alia, the 'Welfare Retirement Clause' of the National Agreement inapplicable."
 
 
 42
 In 1973 Long and the UMW and District 5, representing the employees, negotiated and signed the last of these renewal contracts, which extended from 1974 into 1976 (the "1973 contract"). Under that contract, as under the previous contracts between Long and the Union, Long contributed to the private health and pension fund rather than to the UMW's national fund. In January 1975, Long's drivers were hauling coal from a mine in Indiana, Pennsylvania, for the Barnes and Tucker Coal Company. In the latter part of that month, these drivers were accosted and stopped on a public road outside the mine by UMW representatives and were forceably prevented from hauling coal from the mine unless Long signed the national agreement with the UMW. Long alleges that the UMW took this action in order to compel it also to make payments into the UMW National Health and Retirement Fund. The trustees of that fund now claim amounts from Long varying from $.90 per hour for each hour of classified work done by each of Long's employees from February to December 1975, $1.40 per hour for their work period from December 6, 1975, to December 5, 1976, and $1.54 per hour for the period from December 1976 to the present. The last renewal agreement, which was still in force at the time the Union compelled Long to sign the national agreement, required sixty days' notice by any party desiring termination. The district court found as a fact that Long never received any notice of termination from the UMW.
 
 
 43
 Article II of the national agreement, to which Barnes and Tucker is a signatory, provides:
 
 
 44
 The transportation of coal . . . may be contracted out only to a contractor employing members of the (United Mine Workers of America) Under this Agreement. (Emphasis supplied.)
 
 
 45
 Long asserts that the UMW representatives allegedly were enforcing this agreement when they stopped Long's trucks. According to the district court, it was "(d)ue to the intransigence of the UMW and the weight of economic pressure" that Long signed the national agreement. Long, however, continued to pay into the private health and welfare fund under the 1973 agreement with the Union and made no payments into the UMW National Health and Retirement Fund. Two years after Long executed the national agreement, the trustees instituted this suit.
 
 
 46
 In my judgment, this case presents the issue whether, in a suit by trustees of a union's pension fund, an employer who is already under an obligation to contribute, and who does contribute, to a private pension fund for his employees may raise defenses showing that he has no duty also to pay the trustees for the same employees. I dissent because I believe that such defenses would be good against the trustees. I would vacate the preliminary injunction ordering Long to pay the trustees and would remand for the district court to consider the defenses.[1]
 
 I.
 
 47
 Long's attempt to interpose an antitrust defense raises important issues of policy. Considerations of policy, in my view, favor allowing the defense under the unique facts of this case. As Chief Judge Seitz notes, the Supreme Court, for reasons of policy, has been reluctant to entertain any contract defense based on alleged violation of the antitrust laws. In Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), on which the trustees rely, a merchant had contracted to buy fifty cars of onions. Having taken possession of thirteen cars, and having made some payments to the seller, the purchaser repudiated the contract. The seller then sold the remaining cars for the purchaser's account and sued the purchaser for a deficiency caused by a decline in the price of onions. The purchaser raised as a defense that the seller had imposed the contract through a violation of the antitrust laws. The Court barred this defense, but in advancing the reasons for its decision, it chose grounds that, I believe, exclude the instant case. Judge Adams, too, reaches the conclusion "that the policies articulated in Kosuga do not appear to preclude consideration of Long's antitrust defense." Conc.Op. at n. 1.
 
 
 48
 First, the Supreme Court cautioned against judicial additions to the express remedies of the Sherman Act. Id. at 519, 79 S.Ct. 429. But since the Court reserved a contract defense when "the judgment of the Court would itself be enforcing the precise conduct made unlawful by the (Sherman) Act," Id. at 520, 79 S.Ct. at 432, this warning should not be interpreted as a prohibition. The warning should be seen in the light of the policies that it serves. Ordinarily, if treble damages are the exclusive remedy for an antitrust violation and the violation cannot serve as a contractual defense, a party with an antitrust claim will resort to court before others detrimentally rely on the party's contractual obligations. In the instant case, however, the district court wrote that "(t)he national agreement was ignored by everyone until this action was filed by the Trustees." The trustees initiated this suit two years after Long and the UMW signed the contested agreement. The argument based on reliance does not fit the facts of the case.
 
 
 49
 These considerations mesh with the Court's second reason for the result in Kosuga. The Court disapproved of allowing a party to benefit from a contract that it later renounced as illegal. Id. at 519-21, 79 S.Ct. 429. By renouncing the contract, a party could take the benefits of the contract while escaping from its burdens. The purchaser in Kosuga accepted some of the onions and later repudiated the contract only when repudiation became convenient.[2] Here, however, Long does not seek to obtain a benefit without offering a return. Long has continued to pay into a private pension fund, as it had agreed in the 1973 and earlier contracts.
 
 
 50
 Even if Long might otherwise be able to assert an antitrust defense, the trustees argue that Long cannot raise the defense against them. They base this argument on Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), and Lewis v. Seanor Coal Co., 382 F.2d 437 (3d Cir. 1967), Cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968). But Long does not come within the rationale of either case.
 
 
 51
 In Benedict the trustees of a retirement fund sued a coal company for payments owed to the fund, which was the third-party beneficiary of a contract between the company and the UMW. In defense, the company interposed breaches of that very contract by the UMW. The company argued "that in an amount equal to the amount of the damages sustained from the union's breaches, no fund property came into existence." 361 U.S. at 465, 80 S.Ct. at 493. The argument, noted the Court, depended upon "whether the agreement is to be construed as making performance by the union of its promises a condition precedent to Benedict's promise to pay royalty to the trustees." Id. Construing the contract, the court found no such condition precedent. The instant case is quite different. Here, Long maintains not that the 1975 national contract with the UMW should be construed differently from the one in Benedict, but that the instrument itself is invalid as a contract. The construction of the contract in Benedict does not govern this case for there is no valid contract for this court to construe.
 
 
 52
 Recognizing the distinction between the construction of an admittedly valid contract (as in Benedict ) and the non-existence of a valid contract, this court has permitted an employer to raise against trustees of a third-party beneficiary pension fund a defense that an ineffective acceptance prevented a contract from coming into existence. Lewis v. Mears, 297 F.2d 101 (3d Cir.), Cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962). In the fourth circuit, Judge Haynsworth has written:
 
 
 53
 The rights of the trustees . . . are entirely derivative. Their right to recover contributions from the mine operator is dependent entirely upon the real agreement between the operator and the union. The trustees have no independent right to insist that an operator make any contribution to the fund, or that it do so on the same basis and under the same formula that other operators contribute. The trustees are the third party beneficiaries of the real agreement between the union and operator, which they may enforce in accordance with its terms, but the fact that the suit is brought for the benefit of the third party beneficiaries would not foreclose a defense that there was no contract . . . .
 
 
 54
 Lewis v. Lowry, 295 F.2d 197, 199 (4th Cir. 1961), Cert. denied, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962). But see Pennington v. UMW, 325 F.2d 804, 819 (6th Cir. 1963) (dictum that Benedict forbids defense of union's duress if raised against trustees for retirement fund), Rev'd as to other portions, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).
 
 
 55
 It is of equal importance that Long's success on this defense would not permit it to secure the benefits of a labor agreement while circumventing the burdens. If the set-off claimed by the company in Benedict had been granted against the trustees, the company would have avoided, to that extent, paying a part of its employees' agreed compensation. The employees had bargained for the payments, which the company had withheld in response to the union's conduct. 361 U.S. at 469, 85 S.Ct. 1585. Long, however, has paid into the private pension fund in accordance with the requirements of its own employees. It does not seek to avoid compensation owed to its employees; it strives only to save itself from paying twice once to the private fund, once to the national.
 
 
 56
 Nor does Seanor govern the instant case. Under the UMW agreement involved in Seanor, an employer had contracted to pay into a pension fund a royalty of forty cents for each ton of coal mined. The same agreement required an eighty-cent royalty for coal acquired by a signatory from a producer that had not signed the national agreement. It was the imposition of the eighty-cent royalty that allegedly violated the antitrust laws, but the employer raised the alleged antitrust violation as a defense to the trustees' suit for the forty-cent royalties. Unlike Long, the employer had no plausible argument that the whole contract was invalid. In suing only for the forty-cent royalties, the trustees did not open themselves to a possible antitrust defense. Moreover, the court in Seanor noted that the employer's defense, if successful, would deprive employees of compensation for which they had rendered services. Again, it should be noted that in this case Long has compensated its employees by paying into the private pension fund.
 
 II.
 
 57
 Because Long challenges the validity of the whole contract, and because it has contributed to a private pension fund, it should be permitted to offer a defense that the Union has violated the antitrust laws. To allow an antitrust defense under these narrow circumstances, I believe, will not subvert the protections that Benedict extends to the trustees of union pension funds when they sue as third-party beneficiaries. Employees are not likely to suffer privation from the successful interposition of the defense, as is urged by the concurrence, since the employer will have contributed to a private fund, as negotiated by the union, to which the employees have given their approval in a valid contract. And the configuration of the facts present in the instant case is not likely to recur so as to deplete, by legal fees, the resources of pension funds across the country.
 
 
 58
 It is true, as Judge Adams observes, that the dispute on which the antitrust defense turns arises out of a purported contract between Long and the UMW, and not between Long and the trustees. But the Union, as the representative of the employees, could protect its interests by intervention in the suit.
 
 
 59
 If Long proves its antitrust defense, the 1975 contract is unenforceable. Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc., 307 F.2d 207 (3d Cir. 1962), Cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963). Accordingly, I would remand for the district court to consider Long's proof of the defense.
 
 III.
 
 60
 Long also urges that the UMW has violated sections 8(d) and 8(e) of the National Labor Relations Act ("NLRA") and that the UMW breached its obligations under the 1973 contract. The basis for the defense under section 8(d) is the Union's failure to give sixty days' notice of its intention to terminate the contract. This failure, Long contends, made the national agreement invalid as to it. There is a parallel contractual argument in that the 1973 contract demanded sixty days' notice of termination. Although the outlines of Long's defense under section 8(e) are somewhat unclear, Long evidently argues that because the national agreement contained a "hot cargo" clause, the whole agreement was unlawful.[3]
 
 
 61
 The district court held that it had no jurisdiction over the labor law defenses and that the contractual defense of the failure to give termination notice was without merit. Like the district court, I believe that the contractual defense is outside the primary jurisdiction of the NLRB and within the jurisdiction of the district court. The trustees sued under section 301 of the NLRA, and in a suit under that section the district court had jurisdiction to consider even allegations that would, if brought before the Board, establish an unfair labor practice. Smith v. Evening News Association, 371 U.S. 195, 197, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Here, according to Long, the UMW breached its obligations under the 1973 contract in such a way as to make the 1975 contract invalid. Even if that allegation would make out an unfair labor practice, the district court did not lose its jurisdiction.[4] On the other hand, I disagree with the district court's conclusion that even if the UMW breached its contractual duties concerning termination, Long waived its rights against the UMW by not asserting the breach until this suit was begun. Because the district court also observed that everyone ignored the 1975 contract until the trustees filed suit, I believe that the facts do not support the theory of waiver. Long had no reason to assert the UMW's breach because before this suit was filed, all of the interested parties treated the second contract as if it did not exist.
 
 
 62
 Jurisdiction over the NLRA defenses is more problematic, since the district court would need to pass not upon a contractual claim that could also have formed a complaint of an unfair labor practice but upon the argument that an unfair labor practice had in fact been committed. Nonetheless, I would hold that these contentions, raised by way of defense in section 301 suit, are among "labor law questions that emerge as collateral issues in suits brought under independent federal remedies" and come within the jurisdiction of the district court. Connell Co. v. Plumbers & Steamfitters Local No. 100, 421 U.S. 616, 626, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).[5]
 
 
 63
 Since the contractual and section 8(d) defenses go to whether Long owes any obligation at all to the trustees, and since Long has been contributing to a private pension fund, the interposition of these defenses against trustees of a third-party beneficiary union pension fund should be permitted for the same reasons that support the allowance of an antitrust defense in these circumstances. I would therefore remand for the district court to consider whether the Union has breached its contractual obligations or violated section 8(d), so as to make the 1975 contract invalid.
 
 
 
 [1]
 Moreover, although I do not dwell on the point because of the approach I take in disposing of this case, I note in passing that the policies articulated in Kosuga do not appear to preclude consideration of Long's antitrust defense. Kosuga concerned the more common factual context of a party that had already performed under a contract suing for payment due, and a defendant seeking to avoid payment by contending that the contract abridges the antitrust laws. As Chief Judge Seitz observes, Kosuga reflects the policies, first, of not permitting a defendant to be unjustly enriched by receiving benefits under the contract while being exempted from performing in return, and second, of not disproportionately penalizing the plaintiff where the antitrust laws already specify a powerful private remedy. See generally, Comment, The Defense of Antitrust Illegality in Contract Actions, 27 U.Chi.L.Rev. 758 (1960). Neither of these policies, however, appear to be applicable to this case, inasmuch as the UMW apparently extracted Long's undertaking to make payments to its pension fund without granting it a quid pro quo, and inasmuch as Long continues to make payments for the benefit of its employees to a private pension fund pursuant to the terms of its contract with the local union. It would seem, therefore, that the situation in this case may be analogized to those in which defendants in a contract suit have been permitted to interpose the defense of antitrust illegality, under the exception left open by Kosuga. See, e. g., Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc., 307 F.2d 207 (3d Cir. 1962); Cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963); Tampa Electric Co. v. Nashville Coal Co., 276 F.2d 766 (6th Cir. 1960), Rev'd on other grounds, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). See also Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 646 n. 3, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (Stevens, J., dissenting) and cases cited therein. But see Pennington v. United Mine Workers of America, 325 F.2d 804, 818 (6th Cir. 1963), Rev'd as to other portions, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)
 
 
 [2]
 In addition to the policy reasons for such a rule, developed Infra, it deserves mentioning that frequent litigation of such disputes would have a deleterious effect upon the pension funds, in that counsel fees for the trustees would have to be paid from their accounts, and may affect the ability of the funds to provide the benefits they were designed to provide
 
 
 [3]
 361 U.S. at 469, 80 S.Ct. at 495
 
 
 [4]
 Id. at 470, 80 S.Ct. at 496
 
 
 [5]
 Two additional factors were mentioned by the Supreme Court. Though more closely connected to the discrete issue raised in Benedict whether a contract rule of construction for interpreting the intent of the parties should be applied to a labor agreement than are the two general considerations highlighted in the text, they, too, are noteworthy. The Court observed that, "(i)n a very real sense Benedict's interests in the soundness of the fund and its management is in no way less than that of the promisee union" since "(i)t is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death." 361 U.S. at 468-69, 80 S.Ct. at 495. The Court also deemed relevant the fact that the agreement was industry-wide, and that it was doubtful that the other coal operators had intended to assume the risk of being pressured to increase their contributions in the event that one or more of their co-signatories were absolved because of union strikes and work stoppages
 
 
 [6]
 361 U.S. at 471, 80 S.Ct. at 496
 
 
 [7]
 See, e. g., Lewis v. Mill Ridge Coals, Inc., 298 F.2d 552, 557 (6th Cir. 1962) ("The Supreme Court has now placed collective bargaining contracts in a special class, exempt from some of the rules of construction traditionally applicable to contracts.")
 
 
 [8]
 See, e. g., Lewis v. Mill Ridge Coals, Inc., 298 F.2d 552 (6th Cir. 1962); Boyle v. North Atlantic Coal Corp., 331 F.Supp. 1107 (W.D.Pa.1971); Lewis v. Seanor Coal Co., 256 F.Supp. 456 (W.D.Pa.1966), Aff'd, 382 F.2d 437 (3d Cir.), Cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1967); Lewis v. Harcliff Coal Co., 237 F.Supp. 6 (W.D.Pa.1965)
 The one situation where courts have been reluctant to apply the rationale of Benedict as fully as they might have is in permitting an employer to show by parol evidence that no agreement at all was intended by the parties. See, Lewis v. Mears, 297 F.2d 101 (3d Cir.), Cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962) (but petition for rehearing denied by equally divided court, with published dissent); Lewis v. Lowry, 295 F.2d 197 (4th Cir. 1961), Cert. denied 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962) (with Sobeloff, Chief Judge, dissenting). To the extent these decisions are consistent with the prevailing trend of judicial opinion, they might be explained as recognizing that whereas it is reasonable to demand in other circumstances that the employer initiate suit if it wishes to be absolved from liability, it is unreasonable to expect that it do where it believes that both it and the union had no intent to create a binding agreement. In the latter situation, the employer should not be expected to know that a potential adversary exists or that it is jeopardizing the expectations of its employees.
 
 
 [9]
 See, e. g., Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 Et seq., repealing Welfare and Pension Plans Disclosure Act of 1959, as amended in 1962, 29 U.S.C. §§ 301 Et seq
 
 
 [10]
 On July 12, 1978, Executive Order No. 12071 was promulgated, establishing an eleven-member Commission on Pension Policy to examine public and private pension systems and to suggest reforms, as part of an effort to develop national policies for disability, survivor, and retirement programs. 47 U.S.L.W. 2052 (July 25, 1978)
 
 
 [11]
 Also, there is always the danger that while the defense to the trustees' suit is being litigated, the employer may become financially pressed and unable to make payments, and the employees would then be without any recourse
 
 
 [12]
 Chief Judge Seitz agrees that the rule laid down by Benedict and subsequent cases requires that Long pay the amounts already owed to the health and retirement funds, but believes that the trustees' request that Long be compelled to make future payments as they become due may be subject to different treatment. In view of the far-reaching policy considerations elaborated upon in the text that underlie the Benedict rule, no practical purpose would be served in creating a dichotomy between retrospective and prospective relief. Moreover, such a distinction would appear to be unrealistic because unless the trustees refrain for some reason from enforcing the employer's promise to contribute to the funds until after the labor agreement has expired, the trustees will invariably combine claims for retrospective and prospective relief
 
 
 [13]
 Such risk to the employees' interests may exist, for instance, in the present case. There is no indication in the record that Long's employees are more secure or receive greater benefits under the private pension plan than they would under the UMW program. Indeed, the private arrangements may be wholly inadequate
 
 
 [1]
 In the absence of factual findings concerning the substance of these defenses, it is unnecessary to reach the interesting question whether the UMW has indeed breached its contractual obligations or violated the antitrust or labor laws
 
 
 [2]
 That the price of onions was dropping, 358 U.S. at 519, 79 S.Ct. 429, may explain the repudiation
 
 
 [3]
 Long appears not to argue that the national agreement was imposed by virtue of a violation of section 8(e)
 
 
 [4]
 The trustees have tried to invoke the statute of limitations contained in section 10(b) of the NLRA, 29 U.S.C. § 160(b) (1970), which forbids the issuance of a complaint "based upon any unfair labor practice occurring more than six months before the filing of the charge with the Board." This limitation, argue the trustees, ought also to bar defenses in section 301 suits, even though the limitation refers only to complaints brought before the Board. But the Supreme Court has allowed a litigant to bring a section 301 suit upon allegations that would have constituted an unfair labor practice occurring more than six months before suit. Smith v. Evening News Association, 371 U.S. 195, 197 n. 5, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Since the purpose of a statute of limitations is to bring possible plaintiffs into court without undue delay and to guarantee the repose of possible defendants, there is even better reason to permit a Defense based upon allegations that might otherwise make out an unfair labor practice occurring more than six months before suit was filed
 
 
 [5]
 Nor does the statute of limitations contained in section 10(b) of the NLRA, 29 U.S.C. § 160(b) (1970), bar this defense. By its own terms, that bar applies to complaints issued by the Board and not to defenses in a section 301 suit. See also n. 4 Supra